William B. URSIC, Plaintiff,

v.

BETHLEHEM MINES, a Subsidiary of Bethlehem Steel Corporation, the Pension Plan of Bethlehem Steel Corporation and Subsidiary Companies, and D.W. Kempken, Plan Administrator, Defendants.

Civ. A. No. 81–086.

United States District Court,
W.D. Pennsylvania.

Feb. 1, 1983.

Stanford A. Segal, Gatz, Cohen, Segal & Koerner, Pittsburgh, Pa., for plaintiff.

Carl H. Hellerstedt, Jr., Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendants.

## OPINION

DUMBAULD, District Judge.

Plaintiff, William B. Ursic, brings this action for violation of 29 U.S.C. 1140 [§ 510 of Act of September 2, 1974, 88 Stat. 895, commonly known as ERISA] for wrongful deprivation of pension rights by contrived pretextual discharge prior to the vesting of such rights.

That section provides:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.... The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

29 U.S.C. 1132 authorizes civil actions by participants in the plan to enforce their rights or redress violations. Jurisdiction is given to District Courts by § 1132(e)(1). The Court in its discretion is empowered by § 1132(g) to "allow a reasonable attorney's fee and costs of action to either party."

The Court's order of March 5, 1982, denying defendants' motion for partial summary judgment, held that by reason of his discharge on June 18, 1980, before he completed the thirty years of service necessary to qualify for a thirty year pension, plaintiff did not qualify literally under the terms of the plan and could recover only if he could establish that his discharge was pretextual and contrived by defendants in order to prevent his receiving the thirty year pension to which he would be entitled if permitted to complete the thirty year period of service. Non-jury trial on this issue was held January 4–6, 1983.

When discharged, plaintiff had worked 29 years, 5 months, and 11 days. His work record was good and he was highly regarded by his superiors (as testified by David Sparks, the division manager, and as also shown by performance appraisals, PX 5–8). He excelled particularly with respect to production. He displayed less aptitude with regard to his paper work. As shift foreman, he was the highest ranking supervisor during night shift.

In 1979 plaintiff was involved in domestic difficulties, leading to divorce in June 1980, and health problems with a bleeding ulcer. On occasion he had to leave the mine to attend court hearings or to get medicine. These absences were known to and acquiesced in by his superiors. They were not factors in the decision to discharge him. As tension increased he sought a leave of absence, but was urged to "hang in." He

decided he would like to retire when his thirty year service was completed in January, 1981.

In his discussions with the personnel office regarding his pension eligibility he indicated that he wished to show lower income for purposes of his divorce case. However, he talked freely around the mine about his intention to retire and did not observe any circumspection or secrecy about his plans and his superiors knew of his proposed retirement and endeavored to discourage him, saying he was too young to retire.

Charles McGlothlin, superintendent of the mine, came to that position in July, 1979, when the mine was idle, and (being cost conscious) he had leisure to compare the figures of that mine with those of the mine of similar size from which he had come. He noted that small tool costs were $100,000 as compared with $20,000 in his former workplace. A principal project he promoted was reducing these costs.[1] To a posted sign forbidding unauthorized removal of tools from the mine he added a provision that random search of lunch-buckets would be conducted. This impressed some of the men, but many continued to carry tools into and out of the mine, particularly those carried on their belts and needed for work in the mine.

As David Sparks (the division manager) testified, the posted notice does not relate to borrowed tools. It is discretionary with the superintendent what tools may be borrowed. He is expected to consider the best interests of the company, and not permit removal of tools needed for operation of the mine. Usually large items (such as jacks) were lent, which were expensive and not readily available elsewhere to employees, but which were needed for their temporary personal use. McGlothlin himself had borrowed jacks for use at his home to repair the porch, when he was engineer at the mine in 1969. He had obtained written permission on that occasion.

McGlothlin asserted that no one but himself was permitted to authorize removal of items from the mine, and that he would never have authorized removal of hand tools; but there was no written procedure prescribing how or from whom permission was to be obtained. According to the testimony of Michael Error, General Mine Foreman since March 1, 1980, taking items with permission was a practice that grew up alongside of and independently of the posted sign about random bucket searches.

McGlothlin after conversations at his home with an employee named William Zgorliski who did not get along with plaintiff obtained permission from Sparks to hire a private detective agency to "tail" plaintiff. Surveillance began on May 1, 1980.

After much chaff, including a report about plaintiff helping one Jacobson transport some cracked plastic pipe of no value to the company which Jacobson had obtained permission to take,[2] McGlothlin at 5:45 or 6 a.m.[3] on June 18, 1980, heard from the investigators that at 2:20 A.M. plaintiff had placed two bundles behind the back seat of his truck. At 6:15[4] McGlothlin called Sparks and they agreed to meet at the mine. After Ursic had completed his shift and his paper work and showered, at about 8:30 they told him they had information he had removed property from the mine and put it in his truck. He said he had taken some tools. They said they wanted to see what was there. He said, come out and see. He opened the truck, handed one bundle wrapped in newspapers and taped with

1. When McGlothlin left the post of superintendent in May 1981, to work for another employer in Utah, tool costs had been cut to $60,000.

2. Apparently McGlothlin regarded this incident as damning because a greater quantity of the worthless pipe was taken than was specified in the permission, and plaintiff hauled some of it in his truck. The destination to which he transported it was not shown, nor that he acted

*animo rem sibi habendi.* It was decided that this incident was not sufficient to justify a discharge and nothing came of it.

3. The private investigator's report PX–3, gives the time as 5:35 A.M.

4. Sparks testified that McGlothlin called at 5:30.

black tape to McGlothlin and carried the other similar package in to the office.[5] Upon being opened, the bundles contained wrenches, weighing about 20 pounds, and said to be worth $419.12. Plaintiff said he needed them to work on a tractor or bulldozer on his farm.

McGlothlin said that this presented a serious situation. Sparks said that discharge or demotion were the only realistic alternatives. Plaintiff became emotional, and asked to be allowed to retire on pension. Sparks and McGlothlin said they would have to deliberate and consult with other company officials on what course to take, and told plaintiff to call at 4 p.m. The interview ended after 10 a.m.[6] When he called at 4, he was notified of his discharge. Meanwhile they had talked by telephone to Tom Robertson of Industrial Relations and to Dan Mills, assistant to the general manager, who were at a meeting in Kentucky.[7] When Mills asked for McGlothlin's recommendation, he and Sparks had agreed to terminate plaintiff and this course was adopted. (Although either discharge or demotion would have precluded plaintiff's getting his thirty year pension since that was available only to salaried employees, McGlothlin was doubtless correct in concluding that a man of plaintiff's personality would not have been effective in a lesser, non-managerial position).

In light of the foregoing events emerging from the record, what conclusions are to be derived with respect to the crucial issue in the case? An inevitable impression is generated that the plaintiff must prevail, for the reason that the defendants' version of the matter is a fabricated structure, designed to support a preordained purpose.

The demeanor and manner of Charles McGlothlin, as well as the content of his narrative, demonstrate that he is cost-conscious and would welcome a strategy of reducing pension payments from the corporate treasury. This strategy involved the resurrection and re-evaluation of rumors previously rejected as the fulminations of a disgruntled spouse or other sources lacking in credibility.

In particular, the covert communications shared with McGlothlin by William Zgorliski, which gave impetus to the program of spying upon Ursic, were especially valueless. As a witness, Zgorliski impressed the finder of fact as a vacuous, self-centered "hippie" type, whose testimony was altogether worthless and lacking in probative value.

The costly surveillance operation likewise produced no paydirt until the revelation regarding the two parcels of tools, plus a pair of pliers, allegedly worth $419.12. *Parturient montes, nascetur ridiculus mus.*[8] Assuming that the tools were in fact worth that much, it seems incredible that such a peccadillo would be treated in and of itself as a cause for discharging a capable employee, with a good production record extending over more than a quarter of a century. Most disciplinary measures under modern labor relations procedures commence with less severe penalties and reserve discharge as the ultimate punishment for more serious or repeated offenses.

Whatever importance the cost-conscious superintendent attached to his pet program of cutting tool expenditures, there is an atmosphere of "invidious discrimination" when only one employee, and the one who is within hailing distance of his hard-earned pension, is subjected to strict enforcement of McGlothlin's unwritten edict, to secret surveillance by expensive private investigators, and to discharge for taking from the mine a trifling quantity of hand tools, while other employees roam in and out of the mine without a single dinner bucket being searched for contraband.

The inescapable inference is that an ulterior motive lay behind defendants' maneu-

---

5. According to PX–3, *supra* note 3, Ursic handed both packages to McGlothlin at 8:51 a.m.

6. PX–3 shows Ursic drove home at 9:58 a.m.

7. According to McGlothlin, they talked to Mills in Bethlehem, Pa. According to Robertson, Mills was with him in Kentucky.

8. Horace, *Ars Poetica,* 1. 139.

vers, and that a speedy discharge, before Ursic's thirty year pension vested, was aimed at. The reasons given for his discharge were pretextual and the true purpose was to deprive him of his impending pension rights. This is the kind of conduct ERISA was enacted to prevent.

A corroborative circumstance, though the finder of fact attaches no weight to it, is the fact that Ursic, at 48, would have been the youngest Bethlehem employee ever to receive a 30 year pension. The youngest actually to receive such a pension was aged 50 years and 7 months. In August, 1982, effective January 1, 1983, the pension plan was modified so as to discourage early retirement by proportionally diminishing the amount of the pension. By reasoning akin to that excluding evidence of subsequent erection of a warning signal or safety gate at a grade crossing as proof of the railroad company's prior negligence, we disregard these circumstances as evidence of intent to deprive Ursic of his pension rights. It is true that subsequent events may often demonstrate the existence of earlier conditions (as X-ray pictures taken after the cut-off date for "black lung" benefits may prove the existence of pneumoconiosis at an earlier and relevant period); and the later modification of the Bethlehem pension plan might be the outgrowth of a prior policy of discouraging early retirement by employees still young enough to serve the company many years in the future before they are turned out to pasture. But a policy of discouraging retirement is not the equivalent of a wrongful effort to deprive an employee of a right accruing to him under an established plan. We therefore reject this argument advanced by plaintiff, but conclude, upon the basis of other evidence reviewed above, that plaintiff is entitled to prevail in the case at bar.

This opinion shall be deemed to constitute the Court's findings of fact and conclusions of law.

Since the parties have stipulated as to the amount of damages, judgment will be entered for plaintiff and the extent of his remedy determined in accordance with the stipulated figures. The Court also awards costs and counsel fees to plaintiff, pursuant to 29 U.S.C. 1132(g) which presumably under Third Circuit practice will require calculation under *Lindy* principles,[9] and plaintiff is directed to make prompt application therefor accordingly.

## JUDGMENT

AND NOW, this 1st day of February, 1983, for the reasons set forth in the foregoing opinion,

IT IS ORDERED, ADJUDGED, DECREED, AND FINALLY DETERMINED that judgment be and the same hereby is entered in favor of plaintiff William B. Ursic, and against Bethlehem Mines, a Subsidiary of Bethlehem Steel Corporation, The Pension Plan of Bethlehem Steel Corporation and Subsidiary Companies, and D.W. Kempken, Plan Administrator, in the amount of $59,765.54, as well as pension payments at the rate of $1,477.99 per month from February 1, 1983, to June, 1997, and thereafter, during plaintiff's life, at the rate of $1,269.89 per month (unless said pension payments are modified by reason of exercise by plaintiff of options available under the pension plan); together with reasonable counsel fees and costs, to be determined hereafter in accordance with the practice established by *Lindy Bros. v. Am. Radiator Inc.,* 540 F.2d 102 (C.A. 3, 1976), and its progeny.

---

**9.** *Lindy Bros. v. Am. Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (C.A. 3, 1976), and its progeny. "What Judge Aldisert foresaw [540 F.2d at 116] has here come to pass: the fee proceedings have become the main event, rather than the side show, assuming 'massive proportions, perhaps even dwarfing the case in chief.'" *Mills v. Eltra Corp.,* 663 F.2d 760, 761 (C.A. 7, 1981). May it be otherwise in the case at bar!