Paul FURCINI, Plaintiff,

v.

EQUIBANK, NA, Defendant.

Civ. A. No. 86–50.

United States District Court,
W.D. Pennsylvania.

May 21, 1987.

Joseph A. Vater, Jr., Meyer, Unkovic & Scott, Pittsburgh, Pa., for plaintiff.

Joan Sheak, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Allentown, Pa., John O'Keefe, Kincaid & McGrath, Pittsburgh, Pa., for defendant.

## OPINION

ALDISERT, Circuit Judge.[*]

This is an employment discrimination proceeding brought under section 510 of the Employee Retirement Income Security Act, 29 U.S.C. § 1140, in which the plaintiff, Paul Furcini, alleges that the defendant, Equibank, NA, characterized his discharge as one "for cause" for the purpose of interfering with his receipt of severance pay under Equibank's employee benefit plan. After conducting a bench trial, the court concludes that Furcini has not carried his burden of persuasion on the ultimate issue in this case: whether Equibank's actions were taken with the specific intent to interfere with Furcini's receipt of severance pay under its severance pay plan. Accordingly, judgment will be entered in favor of Equibank.

Furcini has filed a two-count complaint. He brought count one of his complaint under section 502 of ERISA, 29 U.S.C. § 1132(a)(1)(B), which allows a plan participant or beneficiary to bring actions "to recover benefits due to him under the terms of his plan, [or] to enforce his rights under the terms of the plan...." This count was dismissed with prejudice because Furcini had failed to exhaust his administrative remedies before initiating suit. *Furcini v. Equibank, NA*, Civ. No. 86–50 (W.D.Pa. June 19, 1986) (order) (Teitelbaum, J.) [Available on WESTLAW, DCT database]; *see Wolf v. National Shopmen Pension Fund*, 728 F.2d 182, 185–86 (3d Cir.1984). Count two of Furcini's complaint alleged that Equibank's actions violated section 510 of ERISA, 29 U.S.C. § 1140. Because exhaustion of administrative remedies is not required in a suit under section 510, the parties proceeded to trial on count two. *See Zipf v. AT & T*, 799 F.2d 889, 893 (3d Cir.1986); *Gavalik v. Continental Can Co.*, 812 F.2d 834, 849–50 (3d Cir.1987). We have jurisdiction over this action under 29 U.S.C. § 1132(e)(1). Venue is proper in this district based on 29 U.S.C. § 1132(e)(2). The following shall constitute the court's findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

### I.

Paul J. Furcini began his employment with Western Pennsylvania National Bank, which is now Equibank, in February of 1965, when he was hired as a computer operator. Tr. 17. After a series of vertical promotions and lateral transfers within Equibank, Furcini became vice-president in charge of the credit card division of Equibank's consumer credit department in July of 1984. *Id.* at 18–19, 30–31. He functioned in this capacity until December 6, 1984, when he was discharged by Equibank. *Id.* at 11.

At the time of his discharge, Equibank had a severance pay plan that excluded employees from receiving that benefit when they were discharged "for cause." As relevant to this case, discharges for cause are those for willful misconduct, a violation of bank policy, or poor performance. Exhibit J–1 at 7. Because his discharge was characterized as one for cause, Furcini did not qualify for or receive severance pay under Equibank's plan. Tr. 36, 243. Had Equibank given Furcini severance pay, he would have received $16,250.00. *Id.* at 11.

As vice-president in charge of Equibank's credit card division, one of Furcini's duties was to oversee and insure the effective collection of delinquent credit card accounts. *Id.* at 111–12. During his tenure with Equibank, Furcini was instrumental in developing, modifying, and overseeing the re-aging of delinquent accounts. *Id.* at 38–61, 87, 99–103, 105; exhibits P–7, P–11, P–13, D–1. Re-aging is the manipulation or alteration of an account's payment status on a bank's records to make the account appear to be more current than it actually is. Tr. 196. An account that otherwise would be delinquent can be re-aged so that it is regarded as current. Furcini also implemented charge-off procedures for accounts no longer deemed to be collectible.

[*] Ruggero J. Aldisert, Senior Judge of the United States Court of Appeals for the Third Circuit, sitting by designation.

*Id.* at 102–03, 105–07; exhibits P–7, P–11, P–13, D–1. When a bank charges off an account, the amount owed to the bank is no longer carried as an asset on the bank's balance sheet. Tr. 199. Re-aging and charging-off are related concepts: if an account is re-aged, the time at which it must be charged off can be postponed. One of the criteria by which Furcini was evaluated was whether his department had maintained a low level of charge-offs. *Id.* at 112–13.

In 1984, Equibank underwent senior managerial and operational changes resulting from a cease and desist order imposed by bank regulators. *Id.* at 185–86. In August of 1984, Equibank hired Claire Gargalli as senior executive vice-president. *Id.* at 184. At that time, she had twenty years of banking experience. *Id.* at 184–85. Equibank hired Mrs. Gargalli to evaluate the banking practices then existing at Equibank, and to remedy any deficiencies in those practices. *Id.* at 186. Mrs. Gargalli testified that an example of an improper banking practice she discovered was that Equibank would cash checks drawn on other banks without waiting for the checks to clear from the drawee banks. *Id.* at 191–92. In November of 1984, Mrs. Gargalli became Equibank's president. *Id.* at 184.

Upon joining Equibank, Mrs. Gargalli held group and individual meetings with Equibank employees, repeatedly requesting them to disclose problems in their departments and to report any instances of imprudent banking practices. *Id.* at 189. Mrs. Gargalli understood that, prior to her arrival, identical requests had been made by Equibank's then-president and board chairman James Lowry. *Id.* As part of the management request to come forward, employees were promised that they would not be penalized for voluntarily disclosing imprudent banking practices. *Id.* at 189–90. The court finds that Furcini knew of this management request.

Between May and August of 1984, then-president Mr. Lowry instructed all senior bank personnel to promptly charge off non-performing loans. *Id.* at 149–50, 185–86. Richard Hallstein, the senior vice-president

of consumer credit and Furcini's supervisor, informed Furcini of Mr. Lowry's instruction. *Id.* at 149–51. In the summer of 1984, Furcini reviewed the consumer loan portfolio and determined that between $600,000 and $700,000 in delinquent accounts were eligible to be charged off. *Id.* at 82–84. He discussed this matter with Mr. Hallstein. *Id.* at 81–84. Furcini knew that Mr. Hallstein's banking experience was minimal. *Id.* at 97.

In November of 1984, Mrs. Gargalli hired Rocco Abessinio as senior vice-president in charge of consumer credit; he thus became Furcini's superior. *Id.* at 30, 191. Mrs. Gargalli requested Mr. Abessinio to examine closely the procedures being followed in the consumer credit department. Although he normally reported to Jerry Wojcicki, the executive vice-president in charge of community banking, Mr. Abessinio also could report any adverse findings directly to Mrs. Gargalli. *Id.* at 191–94. In late November, Mr. Abessinio told Mrs. Gargalli that he had discovered a problem with re-aging in the consumer credit portfolio, that the author of the re-aging practice was Furcini, and that re-aging was employed to keep charge-offs at a predetermined level. *Id.* at 194–202. Mr. Abessinio recommended to Mrs. Gargalli that Furcini be discharged for cause; Mrs. Gargalli concurred in his recommendation. *Id.* at 203–04. Mr. Abessinio advised Judith Yankovic, the senior vice-president of human resources, of the re-aging practiced under Furcini's management and of the decision to discharge him. *Id.* at 241–42. As administrator of Equibank's severance pay plan, Ms. Yankovic determined that Furcini's discharge fell within the provision of Equibank's plan that precluded employees discharged for poor performance from receiving severance pay; Ms. Yankovic therefore determined that Furcini was ineligible for that benefit. *Id.* at 243–44. This action followed.

## II.

To make clear what is the statutory basis for Furcini's claim, and what is not, it is necessary to begin with the text of the

statute. In relevant part, section 510 of ERISA provides:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. Furcini's claim is not stated under the "exercise clause" of section 510; he does not claim that Equibank characterized his discharge as one for cause because he availed himself of some right under his employee benefit plan. Rather, Furcini claims that Equibank violated the "interference clause" of section 510; he alleges that Equibank purposefully interfered with his attainment of a right, severance pay, to which he otherwise would have become entitled.

Notwithstanding his counsel's protestations to the contrary, see tr. 282, Furcini has not alleged a "discharge" claim under section 510; he does not claim that he was discharged for the purpose of interfering with his attainment of a plan right. Indeed, the right that Furcini claims Equibank denied him, severance pay, necessarily presupposes his discharge.[1] Nor is Furcini's claim a "fine, suspend, expel, or discipline" claim. Rather, Furcini's complaint sounds under the "discrimination" prohibition of section 510. It is Equibank's characterization of his discharge as one for cause that Furcini claims is unlawful; he alleges that his discharge was so characterized for the purpose of interfering with his receipt of severance pay.

When reduced to its essentials and stated in the context of the statute, Furcini's claim is that Equibank discriminated against him by characterizing his discharge as one for cause for the purpose of denying him severance pay, a right to which he otherwise would have been entitled under

Equibank's benefit plan. The court now must examine the requirements for such a claim and must evaluate whether they were fulfilled by the proof adduced at trial.

## III.

In *Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir.1987), the United States Court of Appeals for the Third Circuit recently explained the requirements for making out a claim under section 510 of ERISA. The court stated that "the essential element of proof under § 510 is specific intent to engage in proscribed activity." *Id.* at 851. The *Gavalik* court recognized, however, that a plaintiff rarely will have direct "smoking gun" evidence of an employer's unlawful purpose. *Id.* at 852. Rather than foreclose such plaintiffs from making out a claim, the *Gavalik* court approved the use of circumstantial evidence to show an employer's specific intent to interfere with an employee's rights. *Id.* at 852–53.

In establishing the framework for making out a case under section 510 using only circumstantial evidence of discrimination, the *Gavalik* court transplanted into the ERISA field the burden-shifting minuet of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As modified by *Gavalik*, the *McDonnell Douglas* formula for section 510 cases first requires the plaintiff to make out a prima facie case by demonstrating:

(1) prohibited employer conduct
(2) taken for the purpose of interfering
(3) with the attainment of any right to which the employee may become entitled.

*Gavalik*, 812 F.2d at 852. If the plaintiff succeeds in making out these elements, he obtains a rebuttable presumption of a section 510 violation. *See id.* at 853. The burden of production then shifts to the employer "to introduce admissible evidence

---

**1.** An example of a "discharge" case is where an employer discharges an employee just before the employee is about to attain vested status under a plan, in order to minimize its pension

liability. *See, e.g., Ursic v. Bethlehem Mines,* 556 F.Supp. 571 (W.D.Pa.), *aff'd in relevant part,* 719 F.2d 670 (3d Cir.1983).

1440

of a legitimate, nondiscriminatory reason for its challenged actions." *Id.* If the employer does so, the presumption drops from the case and the burden of production shifts back to the plaintiff to "demonstrate that the employer's articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Texas Dep't of Cmm'ty Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). Throughout these shifting burdens of production, the plaintiff retains the burden of persuasion on the ultimate issue in the case—whether he has been the victim of purposeful interference. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

A.

Just as meanings are sometimes lost in the translation of expressions from one language to another, the utility of formulae can be lost in their migration across legal fields. A brief examination of the *McDonnell Douglas* formula's genesis will be helpful to forward its purpose today. In *McDonnell Douglas,* the Supreme Court set forth the elements of a prima facie case of employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17. A complainant must show:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). Our Court of Appeals has approved the *McDonnell Douglas* formula and its prima facie case requirements for use in cases brought under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634. *See Smithers v. Bailar,* 629 F.2d 892, 894–95 (3d Cir.1980). To establish a prima facie case of discrimina-

tion under the ADEA, a plaintiff must show that

(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was dismissed despite being qualified; and (4) he ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination.

*Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.1987) (in banc).

Neither of these two prima facie case formulations requires a plaintiff to show direct evidence of purposeful conduct as part of his prima facie case. Indeed, the entire *McDonnell Douglas* burden-shifting scheme was designed to dispense with the necessity for doing so. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979)); *Chipollini,* 814 F.2d at 898 (quoting *Thurston,* 469 U.S. at 121, 105 S.Ct. at 621). Accordingly, in the absence-of direct evidence of illicit purpose, a Title VII or ADEA plaintiff seeking to establish a prima facie case must only demonstrate factors that are objectively verifiable, or at least reasonably provable. It is also recognized that, under the *McDonnell Douglas* formula, "[t]he burden of establishing a prima facie case ... is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094; *Massarsky v. General Motors Corp.,* 706 F.2d 111, 118 (3d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).

If a Title VII or an ADEA proceeding does not require a plaintiff to show direct evidence of a purposeful intent, the question becomes whether *Gavalik* now requires that this formidable barrier be surmounted in an ERISA case. This is a very difficult question, because language in *Gavalik* seems to say precisely that. *See* 812 F.2d at 852. If this be so, absent a "smoking gun" case, a plaintiff alleging an ERISA violation would seldom be able to establish a prima facie case. In contrast with both the purpose and operation of the *McDonnell Douglas* formula, *Gavalik* requires a plaintiff not only to show employer conduct that is prohibited, but also to

show that it was taken *for the purpose* of interfering with the plaintiff's attainment of some benefit. *Id.* A literal application of this requirement would mean that a plaintiff with only indirect evidence of purposeful interference would have to produce direct evidence of purposeful interference as part of his prima facie case. The plaintiff would be placed in an obviously impossible position: he would be required to prove initially by direct evidence, that which he need only prove ultimately by indirect evidence. In light of the purpose and operation of the *McDonnell Douglas* formula in Title VII and ADEA cases, we conclude that the teachings of *Gavalik* cannot be literally applied to all ERISA section 510 cases. The question that remains in this indirect evidence case requires the court to determine what prima facie case requirements will forward the purposes of section 510, *Gavalik*, and the *McDonnell Douglas* formula.

### B.

From its inception and thereafter, the *McDonnell Douglas* formula has been recognized to be flexible and adaptable to different factual situations. *McDonnell Douglas*, 411 U.S. at 802 n. 13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Burdine*, 450 U.S. at 253–54 n. 6, 101 S.Ct. at 1094 n. 6; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *Massarsky*, 706 F.2d at 118 n. 13. Moreover, "[t]he method suggested in *McDonnell Douglas* ... was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in

light of common experience...." *Furnco*, 438 U.S. at 577, 98 S.Ct. at 2949. The formula's pliability and sensibility explain its fecundity in the Title VII and ADEA fields.

Our research, however, discloses only one other case apart from *Gavalik* in which the *McDonnell Douglas* formula was considered in a claim under section 510 of ERISA. *See Fischer v. Doremus & Co.*, No. 83 C 8214 (N.D.Ill. Feb. 4, 1985). Nevertheless, we do not pause to consider the wisdom of so expanding the formula's horizons, for our Court of Appeals has spoken to this issue, and in speaking, has approved its use. *Gavalik*, 812 F.2d at 852–53, 858–63.[2] Our present concern is only whether the *McDonnell Douglas* formula can be adapted to the situation with which we are now confronted: an employee who claims that his employer discriminated against him for the purpose of interfering with his receipt of severance pay.

We hasten to add that the doctrine of stare decisis would not halt our inquiry into the appropriate elements of a *McDonnell Douglas* prima facie case under the facts here presented. Notwithstanding that the *Gavalik* opinion did discuss the elements of a prima facie case for an ERISA section 510 claim involving indirect proof, those statements are not binding upon us as precedent. *Gavalik* involved direct evidence of illicit purpose, 812 F.2d at 856, and recognized that the *McDonnell Douglas* formula is inapplicable in such cases. *Id.* at 853. Accordingly, to the extent that *Gavalik* made pronouncements concerning cases based on indirect evidence, those statements are dicta and are not binding upon this court. As explained by Chief Justice Marshall:

It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to con-

---

**2.** We do note in passing that a primary purpose behind section 510 is to protect employees against employer discrimination regarding plan benefits, *see West v. Butler*, 621 F.2d 240, 243–45

(6th Cir.1980) (discussing legislative history of section 510 of ERISA), and that applying the *McDonnell Douglas* formula in this context could help to achieve that goal.

trol the judgment in a subsequent suit when the very point is presented for decision.

*Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821).

## IV.

■ After giving this troublesome question careful attention, the court concludes that the *McDonnell Douglas* formula can be adapted to encompass Furcini's claim. To make out a prima facie case of discrimination, Furcini must only demonstrate (i) that he was a candidate for a benefit protected by ERISA; (ii) that he was denied that benefit; and (iii) that he satisfied the conditions for receiving that benefit. On this basis, we conclude that Furcini established a prima facie case. We emphasize, however, two important considerations: first, that our articulation of these prima facie case requirements is limited to the facts before us, and is not intended to sweep broadly over other factual situations; second, that there is a distinction between the quantum of evidence necessary to establish a prima facie case under section 510, and the quantum of evidence necessary to persuade the trier of fact that section 510 has indeed been violated. We believe that the prima facie case requirements set forth are sufficient here in view of the statutory language and the teachings of case law interpreting Title VII and the ADEA.

### A.

■ At trial, Furcini established that the Equibank severance pay plan was protected by ERISA and that he was a possible candidate for receiving severance pay under that plan. Then, he established that he was denied severance pay under that plan. These points were not contested by Equibank. Thereafter, Furcini attempted to establish that his conduct did not come under any of the applicable reasons for which his severance pay could have been withheld. This issue was to form the hub of the parties' controversy.

As explained above, Equibank's severance pay plan denied severance pay bene-fits to persons discharged for willful misconduct, a violation of bank policy, or poor performance. *See* exhibit J–1 at 7. To demonstrate that he was not terminated for willful misconduct, Furcini testified that he had received unemployment compensation, and that he would not have been entitled to it had he been terminated for willful misconduct. Tr. 84. To show that he could not have been terminated for violating bank policy, Furcini testified that he was not informed of any management request to report poor banking practices to Equibank's new management. *Id.* at 93. To show that his discharge did not come under the "poor performance" provision, Furcini introduced performance appraisals that had been completed by his supervisors. Furcini introduced evidence indicating that from April, 1977 to July, 1984, he had received favorable performance appraisals. Exhibits P–2, P–3, P–4, P–5, P–6.

On the basis of Furcini's showing above, the court concludes that he introduced evidence sufficient to permit it to find, as one permissible inference, that Equibank characterized Furcini's discharge as one for cause for the purpose of interfering with his receipt of severance pay. Equibank therefore was required to go forward with evidence in order to articulate a legitimate nondiscriminatory reason for its actions. *Gavalik,* 812 F.2d at 853.

### B.

To satisfy its burden of production, Equibank introduced testimony on its reasons for characterizing Furcini's discharge as one for cause. Claire Gargalli, Equibank's president, testified that the initial decision to terminate Furcini was made by Rocco Abessinio, the senior vice-president in charge of consumer lending. Tr. 203. Mrs. Gargalli testified that Mr. Abessinio reported to her that credit card accounts were being re-aged in order to maintain a predetermined level of charge-offs. *Id.* at 201–202. Mrs. Gargalli further testified that Mr. Abessinio reported that Furcini was the author of the re-aging practice and that he recommended that Furcini be terminated for cause. *Id.* at 202–03. Mrs. Gargalli testified that she concurred in Mr.

Abessinio's recommendation for two reasons: she believed that re-aging was a serious violation of prudent banking practices on Furcini's part; and that the re-aging persisted in the face of a directive by Equibank's new management requesting all employees to report instances of poor banking practices. *Id.* at 203–04.

Equibank then introduced testimony from Judith Yankovic, the senior vice-president of human resources and administrator of its severance pay plan. Ms. Yankovic testified that she was responsible for determining that Furcini did not qualify for severance pay. *Id.* at 243. She further testified that, upon hearing of Furcini's re-aging practice, she determined that Furcini's discharge fell within the "poor performance" provision of the severance pay plan, and that Furcini therefore was excluded from receiving severance pay. *Id.* at 244.

The court concludes that Equibank's proffered reasons for characterizing Furcini's discharge as one for cause, if true, were legitimate nondiscriminatory reasons for its actions. Accordingly, the court concludes that Equibank satisfied its burden of production. Furcini therefore must be given an opportunity to demonstrate that Equibank's proffered reasons are pretextual. *Gavalik*, 812 F.2d at 853. At this point, Furcini's burden merges with his ultimate burden of persuasion, which is to prove by a preponderance of the evidence that Equibank's purpose to interfere with Furcini's receipt of a benefit protected by ERISA was a determinative factor resulting in its characterizing his discharge as one for cause. *Id.* at 859–60; *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 (plaintiff's burden of proving pretext merges with ultimate burden of proving intentional discrimination).

### C.

Furcini attempted to demonstrate that Equibank's articulated reasons for characterizing his discharge as one for cause were pretextual. Furcini pointed to his favorable performance appraisals to counter Equibank's assertion that poor·performance was the basis for his discharge. *See* exhibits P–2, P–3, P–4, P–5, P–6. Furcini

testified that he was not told that re-aging, as conducted under his supervision, was a poor banking practice. Tr. 93. Furcini testified that he had provided copies of all re-aging practices being followed to Mr. Abessinio upon the latter's arrival at Equibank, but that the two never discussed those practices. *Id.* at 273. Furcini also contends that Equibank has not significantly changed its re-aging practice since his departure. *See, e.g.*, exhibit D–2. Presumably to counter Equibank's evidence that the re-aging conducted under Furcini's supervision was imprudent, Furcini testified that the credit card division was periodically audited by federal, state, external, and internal auditors and that the re-aging was not reported to be a violation of any laws, rules, regulations, or banking practices. Tr. 61–69. To undermine one of the reasons Mrs. Gargalli gave for concurring in Mr. Abessinio's discharge recommendation, Furcini testified that he was not informed of any management request to report imprudent banking practices. *Id.* at 276. Finally, Furcini pointed out that he received unemployment compensation following his discharge, on the theory that if his discharge was for cause he would not have qualified for that compensation. *Id.* at 84.

### V.

At this point, the primary factual issue before the court is whether Equibank characterized Furcini's discharge as one for cause for the purpose of interfering with his receipt of severance pay under Equibank's severance pay plan. *Aikens*, 460 U.S. at 714–16, 103 S.Ct. at 1481–82; *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. As succinctly stated in *Aikens:* "In short, the district court must decide which party's explanation of the employer's motivation it believes." 460 U.S. at 716, 103 S.Ct. at 1482. For Furcini to prevail on his claim, this court must find that Equibank's purpose to interfere with Furcini's receipt of severance pay was a determinative factor in its actions. *Gavalik*, 812 F.2d at 860. For the reasons given below, this court will not so find.

The court determines that Equibank's proffered reasons for characterizing Furcini's discharge as one for cause are not pretextual. The favorable performance appraisals submitted by Furcini lend little, if any, weight to his contention that he could not have been discharged for poor performance. Many of the appraisals were too remote to have much probative value; none of them were conducted by Mr. Abessinio, the supervisor who initially decided that Furcini's performance was unacceptable; nor were they conducted by any other member of Equibank's new management.

The testimony that Furcini was never advised that his re-aging practices were unsatisfactory also does not permit a finding of pretext. It is probable that old management did not so inform him because they themselves did not regard the re-aging as improper. In fact, Mrs. Gargalli testified that she was not confident that Mr. Wojcicki, the executive vice-president in charge of community banking and one of Furcini's superiors, had managed the consumer credit department in a manner consistent with prudent banking practices. Tr. 194. That Mr. Abessinio did not discuss the re-aging practice with Furcini before his date of discharge also does not permit a finding of pretext; it is just as probable that Mr. Abessinio believed the appropriate course to follow was to recommend that Furcini be discharged for cause. Richard Hallstein, a former senior vice-president of Equibank's consumer credit department, stated that in cases of gross mismanagement, employees were terminated without intermediate disciplinary or cautionary action. *Id.* at 160–61.

Furcini's argument that Equibank has not significantly changed its re-aging practice since he was discharged also cannot support a finding of pretext, because he has not sufficiently proven this contention. His sole item of evidence is an internal Equibank memorandum, introduced by Equibank, showing that a restricted form of re-aging was practiced in November of 1984. Exhibit D–2. Furcini has not introduced sufficient evidence of continued re-aging similar to that conducted under his

aegis. His evidence is insufficient to enable the court to make a finding of pretext.

Furcini's evidence that no auditors significantly criticized the re-aging practice does not allow an inference of pretext. Furcini did not sufficiently demonstrate that, had the re-aging practice been imprudent, the auditors would have found and commented upon it. Although Furcini did introduce one instance when the internal auditors criticized an aspect of the re-aging practice, *see* exhibits P–8, P–9, Mrs. Gargalli testified that she was not confident that the internal audits were properly being performed, and that she had replaced the internal audit department. Tr. 186–87.

Furcini testified that he was not aware of any management directive requesting employees to come forward and identify instances of imprudent banking practices being followed in their departments. We do not find this testimony to be credible. Furcini's testimony is at odds with his statement that he reviewed the consumer loan portfolio to determine whether any re-aged accounts should properly be charged off, *id.* at 81–84, an act that would have been a natural consequence of learning that such a directive had been issued.

That Furcini received unemployment compensation also does not permit the court to infer pretext. Ms. Yankovic, Equibank's senior vice-president of human resources, testified that the standard for receiving such compensation is a "willful misconduct" standard. *Id.* at 244. This standard is different from the "poor performance" standard, the standard under which Ms. Yankovic decided that Furcini should be denied severance pay. *See id.* Moreover, Ms. Yankovic testified that Equibank normally did not contest unemployment compensation claims except in cases such as theft. *Id.*

Two additional contentions of Furcini must be addressed at this juncture. Furcini has repeatedly pressed the argument that his evidence of pretext is more compelling than was the evidence of pretext in *Ursic v. Bethlehem Mines*, 556 F.Supp. 571 (W.D.Pa.), *aff'd in relevant part*, 719 F.2d 670 (3d Cir.1983). We disagree. That case contained significant evidence that the em-

ployer treated the plaintiff far differently than it treated other similarly situated employees. *See* 556 F.Supp. at 573–75. No such evidence was presented by Furcini. Furcini also stresses that little of Equibank's testimony has been offered for the truth of the matter asserted therein, and that Equibank therefore has not sufficiently met its burden to articulate legitimate nondiscriminatory reasons for its actions. This argument is likewise unconvincing. The testimony that Furcini refers to was introduced to prove the state of mind of those persons who made employment decisions regarding him. Because their state of mind was the primary factual inquiry in this case, that testimony was properly admitted to satisfy Equibank's burden. *See, e.g., Jones v. Los Angeles Cmm'ty College District,* 702 F.2d 203, 205 (9th Cir.1983) (unsatisfactory service notices introduced by employer in Title VII wrongful discharge case were not hearsay, because offered to show proper motive for termination); *Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1322 (11th Cir.1982) (internal corporate memoranda prepared by employee's supervisors were not hearsay in ADEA case when offered not to prove employee's poor performance, but to prove that employer thought his performance was poor).

Furcini's evidence of pretext is insufficient to allow the court to find that Equibank's proffered reasons for characterizing his discharge as one for cause were not its actual reasons for so doing. An examination of the entirety of the evidence in this case does not permit the court to conclude that Equibank discriminated against Furcini with the specific intent to interfere with his receipt of $16,250.00 in severance pay.

## VI.

Because plaintiff Furcini has not carried the burden of proving his case by a preponderance of the evidence, he cannot prevail on his claim under section 510 of ERISA. Accordingly, judgment will be entered in favor of Equibank, the defendant.