**Robert Douglas CONKWRIGHT,
Plaintiff–Appellant,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Defendant–Appellee.**

**No. 90–2414.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 10, 1991.

Decided May 14, 1991.

Phillips P. O'Shaughnessy, argued (Paul W. Spence, on brief), Sandbower, Gabler & O'Shaughnessy, P.A., Baltimore, Md., for plaintiff-appellant.

Monte Fried, argued (Rosemary A. Gladue, Ann L. Lamdin, on brief), Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for defendant-appellee.

Before PHILLIPS and NIEMEYER, Circuit Judges, and BUTZNER, Senior Circuit Judge.

PHILLIPS, Circuit Judge:

Robert Conkwright appeals the district court's grant of summary judgment to his

former employer, Westinghouse Electric Corp. (Westinghouse), 739 F.Supp. 1006, rejecting Conkwright's age discrimination, ERISA, and pendent state contract claims. We affirm.

## I

Conkwright brought this action after being laid off,[1] at the age of 60, from his position as contracts administrator at Westinghouse's Defense and Electronics Center. He had worked for Westinghouse for nearly twenty years at the time of his layoff, but had transferred to this division, at his option, only a few years before his termination. The average age of the three managers of this division at the time of his layoff was 41; the average age of the staff was 32. Conkwright held the highest salary position in the unit (due to his length of service, though he was not a manager).

Shortly after Conkwright arrived at the division, he was given a job performance rating: on Westinghouse's scale of 1 to 4, he was rated a 2, which means "produces acceptable results-requires improvement." That rating also noted that Conkwright had only recently been assigned to the division. Conkwright's lowlevel duties concerned him, and he complained to management about the lack of challenging work assignments. As a result, his work in international marketing programs was expanded somewhat, in an effort to accommodate his complaints. In January 1984, Conkwright was reviewed again, in an annual review, and was rated 1.9 and described as "floundering." In December 1984, he was given a rating of 2.1. Consequently, Conkwright's rating after over two years in this division stayed essentially the same—a "2 performer" who "produces acceptable results but requires improvement."

In 1985, Westinghouse learned that it had lost a major defense contract known as DIVADS.[2] The loss of the DIVADS contract ultimately resulted in a reduction-in-force (RIF) for Conkwright's division. To implement the RIF, Westinghouse's man-

ager of human resources asked each manager to identify those employees who were "lowest rated" on the performance scale. An initial list submitted by the managers had a disproportionate number of older Westinghouse employees. As a result, Westinghouse's senior management set guidelines for adjusting the lists so that no one close to vesting would be laid off. Once the exact number of positions to be cut had been identified, Conkwright's supervisor was told to lay off the three "lowest rated" employees. The supervisor identified Conkwright along with two other low rated persons, both of whom were under the age of 40. All three were terminated. Shortly thereafter, Conkwright filed this lawsuit based on the Age Discrimination in Employment Act (ADEA), the Employee Retirement Insurance Security Act (ERISA), and state law breach of contract. After discovery, defendant moved for summary judgment, which the district court granted. This timely appeal followed.

## II

On summary judgment, the non-moving party is entitled to have his evidence as forecast assumed, his version of that in dispute accepted, and the benefit of all favorable inferences. *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). We view the summary judgment motion in that light, and we apply the same standard as the district court and determine for ourselves whether there are any genuine issues of material fact that must be resolved by a finder of fact. Fed.R. Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In an age discrimination case, a plaintiff must prove that "but for" his employer's discriminatory intent, he would not have been fired or laid off. *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 238 (4th Cir.1982). A plaintiff can meet this burden either through direct or indirect

---

**1.** Conkwright, having been told that his termination was imminent, decided to take early retirement January 1, 1986.

**2.** DIVADS stands for Division Air Defense System program.

proof, or by invoking the Title VII, *McDonnell Douglas* scheme of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Goldberg v. B. Green & Co.*, 836 F.2d 845 (4th Cir.1988).

Here, Conkwright relies principally upon the Title VII proof scheme, and we address it first.

### A

■ Under that proof scheme, the prima facie case in an age discrimination reduction-in-force case requires proof that the claimant who is in the protected age group was discharged or demoted, was performing his job at the time of discharge at a level that met his employer's expectations, and that either persons outside the protected class were retained in the same position, or that Westinghouse did not treat age neutrally in selecting the claimant for layoff. *EEOC v. Western Elec. Corp.*, 713 F.2d 1011, 1015 (4th Cir.1983).

The only element of the prima facie case which is contested here is whether Conkwright met the legitimate expectations of his employer. As to this element, we hold there was a genuine issue of fact. The ratings that Conkwright received during this time period were all in the 2 range—he was a classic "2 performer." That means that he "produces acceptable results—requires improvement." Westinghouse urges on us the view that the standard means *"requires improvement"* (the emphasis is theirs) and that anyone "requiring improvement" necessarily fails to meet his employer's expectations. It is equally plausible, however, that one could underscore *"produces acceptable results"* (the emphasis is ours) in support of the opposite conclusion. Under that alternative interpretation, Conkwright must have been meeting employer expectations, because he "produced acceptable results." A reasonable trier of fact could accept defendant's

suggestion and interpret Westinghouse's rating system so that the employer's legitimate expectations were that everyone would produce acceptable results *and* improve. That reading would not be wrong, it is just different than the one plausibly advanced by plaintiff. Thus, using the objective evidence available, the rating system, we find that reasonable minds could differ as to whether Conkwright "needed improvement" or "produced acceptable results." If plaintiff is entitled to the benefit of all inferences, then there is a genuine dispute as to whether he met the legitimate expectations of his employer.[3]

### B

■ When a plaintiff establishes a prima facie case, then the employer must present a legitimate, non-discriminatory reason for the layoff. In this case, that is straightforward: the cancellation of the DIVADS contract forced Westinghouse to reduce its force, and the RIF was implemented by choosing the lowest rated persons. Conkwright argues that the district court too readily credited Westinghouse's asserted basis for the layoff, the use of the rating system; instead he contends that the rating system was somehow infected with bias toward Conkwright and older workers. This assertion is misplaced. Deciding to lay off someone based on a company-wide performance rating system, which has been in place for years and which has not been shown to be discriminatory, and choosing to lay off all those who were among the lowest rated, must count as "an articulation of a legitimate, non-discriminatory reason." That is *not* to say that the legitimate, nondiscriminatory reason will not later be found pretextual. But for this stage in the proof scheme it suffices.

### C

■ Having made out a prima facie case and being then confronted with an employ-

---

**3.** This conclusion also finds support in the testimony from some of plaintiff's co-workers and infrequent managers. This evidence, though not as probative as the performance rating, lends credence to the interpretation of the rating system posited by Conkwright. Moreover, we note that Conkwright was given a job with added and enhanced responsibility shortly before his termination. A plausible reading of this job action is that Conkwright was meeting his employer's expectations.

er's articulated non-discriminatory reason, a claimant then has the burden to show that the articulated reason was pretext. To survive a summary judgment motion, Conkwright must therefore demonstrate the existence of a genuine issue of fact as to whether age, rather than the performance ratings, was used by Westinghouse in selecting Conkwright for layoff. We affirm the granting of summary judgment because there is no significant evidence that shows the rating system was a pretext for Conkwright's firing or that age played any role in the termination decision.

Westinghouse management had to cut employees due to the loss of the DIVADS contract. A large number of persons across the company were cut. In choosing whom to lay off, it relied on an ostensibly neutral, merit-based system, its internal rating system. That system generated a list of names of those who were the "lowest rated." Management then adjusted this list to avoid hurting disproportionately minorities or those nearing vesting or retirement, an action that surely does not suggest a pretextual basis for Conkwright's termination. *See McDaniel v. Mead Corp.,* 622 F.Supp. 351, 358–59 (W.D. Va.1985); *see also* part III, *infra* (discussing plaintiff's ERISA claim). Conkwright's name was appropriately on the ratings system list; his ratings put him in the lowest rated category. That co-workers and direct managers may have thought he did a good job, or that he did not "deserve" the ratings or did not "deserve" to get laid off, is close to irrelevant.[4] The system Westinghouse used was objective and facially fair, even if it, like all human endeavors, was imperfectly administered.

There is no evidence to which Conkwright can point as suggesting pretext, except that he met the job expectations of his employers and he was over age 40. Even if we accept that, the ratings system informed Westinghouse that other persons also met their expectations *and* did a better job. Alternatively, the rating system could have told Westinghouse that Conkwright

only barely met their expectations—and if someone had to be terminated it should be him. In any event, Conkwright fails to raise a genuine issue that the rating system was used in a discriminatory manner and was pretextual.

**D**

◼ Conkwright also contends that he has enough direct and circumstantial evidence to create a genuine issue using ordinary proof principles. Proof that a plaintiff was treated unfavorably because of his age can come from direct evidence or "circumstantial evidence, including but not limited to proof of the claimant's general qualifications, from which the inference of age discrimination may rationally be drawn independently of any age presumption." *Cline v. Roadway Express, Inc.,* 689 F.2d 481, 485 (4th Cir.1982) (footnote omitted). Proof of claimant's general qualifications is important in any discharge claim, because "with performance established as satisfactory, there is no reasonable expectation for the challenged action but age discrimination." *Lovelace,* 681 F.2d at 244. But proof of general qualifications is less relevant in a reduction-in-force claim because *someone has to be let go.* Indeed, three someones had to be let go—and two of those chosen were in their 30's.

A plaintiff must prove that it is more probable than not that age discrimination is the reason for his layoff. *Cline,* 689 F.2d at 485–86. Even assuming his general qualifications and giving him the benefit of all inferences, for the reasons discussed in full above we hold that Conkwright has failed to create a genuine issue as to whether his firing was "more probably than not" due to age discrimination. Accordingly, the granting of summary judgment on the ADEA claim is affirmed.

**III**

**A**

◼ Conkwright also seeks damages under § 510 of ERISA, 29 U.S.C. § 1140, on

---

**4.** It is only close to irrelevant because if the ratings were wildly out of line with other indicia of an employee's performance then one may

question whether the rating system had a bias in its implementation. But that is not the case here.

the ground that Westinghouse intentionally sought to deprive him of rights in its pension plan. Section 510 states in pertinent part:

It shall be unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.... The provisions of section 1132 of this title [which provides for civil enforcement] shall be applicable in the enforcement of this section.

29 U.S.C. § 1140. Conkwright contends that § 510 gives fully vested employees a cause of action against an employer who acts to prevent accrual of *additional* benefits. We agree.

Those employees waiting to vest in a qualified pension plan have a cause of action against an employer who discharges them for the purpose of blocking their vesting in the company's pension plan. *See, e.g., Ursic v. Bethlehem Mines,* 556 F.Supp. 571 (W.D.Pa.), *aff'd in relevant part,* 719 F.2d 670 (3d Cir.1983); *Folz v. Marriott Corp.,* 594 F.Supp. 1007 (W.D. Mo.1984); *Titsch v. Reliance Group, Inc.,* 548 F.Supp. 983 (S.D.N.Y.1982). The claim raised by Conkwright, however, is one of first impression for this court, for it seeks recognition of an action by fully vested employees who claim denial not of their vested rights but of their ability to accrue additional benefits.

In considering whether § 510 provides for such a claim, we look first to the statute itself and the intent of Congress. Congress adopted ERISA in order "to remedy certain defects in the private retirement system which limit the effectiveness of the system in providing retirement income security." H.R.Rep. No. 533, 93d Cong., 1st Sess. (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4639; *see also Kross v. Western Elec. Co.,* 701 F.2d 1238, 1242 (7th Cir.1983) ("ERISA is a remedial statute to be liberally construed in favor of employee benefit fund participants."). As part of the new regime embodied in ERISA, Congress adopted private enforcement mechanisms, through civil actions by employees in federal court, in addition to those powers given the Secretary of Labor to enforce the rights secured by the Act.

Both the bills passed by the House and Senate contained enforcement provisions that made it "unlawful to interfere with the attainment of *any rights* to which a participant or beneficiary may become entitled...." H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess. (1974) (emphasis added), *reprinted in* 1974 U.S.Code Cong. & Admin.News 5038, 5110. In incorporating provisions for private enforcement of pension rights, the committees in both Houses which adopted these provisions stated: "The enforcement provisions have been designed specifically to provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of the Act." H.R.Rep. No. 533, 93d Cong., 1st Sess. (1973), *reprinted in* 1974 U.S.Code Cong. & Admin. News 4639, 4655; *see also* S.Rep. No. 127, 93d Cong., 1st Sess. (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News 4838, 4871 (also stating goal of enforcement provisions is to give beneficiaries "broad remedies for redressing" violations of Act).

The conference committee on ERISA adopted § 510 without much discussion, except to make clear that "the participant or beneficiary may bring a civil action against any person who interferes with his rights which are protected under the Act." H.R. Conf.Rep. No. 1280, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 5038, 5110. Upon introducing the conference report in the Senate, Senator Harrison Williams, chairman of the Senate Committee on Labor and Public Welfare, noted: "A further protection for employees is the prohibition against discharge, or other discriminatory conduct toward participants and beneficiaries which is designed to interfere with attainment of vested benefits *or other rights* under the bill, or to discourage the exercise of *any rights* afforded by the legislation. Either the employee or the Secretary of Labor may bring suit to redress such violations." 120 Cong.Rec. S 15,737 (Aug. 22, 1974)

(statement of Sen. Williams) (emphasis added), *reprinted in* 1974 U.S.Code Cong. & Admin.News 5177, 5188.

Viewed against this background, it has been recognized that the primary focus of § 510 is to "prevent[ ] unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980) (discussing § 510 suit to enjoin secondary picketing). But other courts looking to § 510 to answer the same question we consider here have noted that though the goal of preventing discharge to block vesting of pension rights is undeniably the primary purpose of this section, there is also "room for a construction that extends section 510 protection to vested employees as well." *Clark v. Resistoflex Co. Div. of Unidynamics, Corp.*, 854 F.2d 762, 770 (5th Cir. 1988).

Extending § 510 to encompass claims brought by vested employees for denial of additional benefits comports with both the legislative language and the intent of Congress to give employees "broad remedies" for violations of pension rights. Section 510 prohibits an employer from discharging an employee "for the purpose of interfering with the attainment of *any* right to which such participant *may* become entitled" under a benefit plan. 29 U.S.C. § 1140 (emphasis added). Surely, Congress was not limiting § 510 only to those rights which a participant acquires upon vesting, or it easily could have referred to "vested rights." Similarly, the statute refers to rights to which a participant "may become entitled," which is to say that § 510 permits suits for interfering with rights not yet earned. We have no reason to constrict this "broad remedial" provision to only vested rights when the Act clearly contemplates suits to protect *any* rights implicated by employer action.

We also must take note that § 510 is a companion enforcement provision to § 502, 29 U.S.C. § 1132. *See* 29 U.S.C. § 1140 ("The provisions of section 1132 of this title shall be applicable in the enforcement of this section."). Section 502 authorizes a participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. . . ." *Id.* § 1132(a)(1)(B). In this way, §§ 502 and 510 together protect the panoply of rights at risk in the pension context: rights about to be earned but frustrated due to unlawful employer action, benefits earned but not paid, other rights due a participant but not fulfilled, and future benefits earned but not yet due. Not to give § 510 the reading we think it is due would result in giving vested employees, the most senior workers, *less* protection than that afforded junior workers. That is because an unvested worker discharged for the purpose of interfering with his not-yet-vested rights clearly can sue under § 510, *see, e.g., Ursic, supra; Folz, supra; Titsch, supra,* but a worker who already has vested would be without legal recourse to protect his (additional) pension rights. As the Seventh Circuit noted, "There is no evidence that Congress intended ERISA to afford less protection to senior employees than that enjoyed by probationary or junior employees who have not qualified for coverage under particular employee benefit plans." *Kross,* 701 F.2d at 1243.

This holding is consistent with the other circuits that have considered the question. An early case addressing the vitality of a § 510 claim by a vested employee is *Kross, supra.* In *Kross,* the Seventh Circuit rejected the view "that § 510 of ERISA does not protect an employee who has already qualified for coverage under a company-provided insurance plan. . . . Congress did not enact ERISA with the intent to negate the long established practice of affording greater benefits and protections to those employees who have more seniority in time of service with the company than to junior employees." 701 F.2d at 1243. Largely following the analysis of the Seventh Circuit, the Fifth Circuit, though reserving final judgment on the question, definitely saw "room for a construction [of § 510] that extends section 510 protection to vested employees as well." *Clark,* 854 F.2d at 770.

Another important case recognizing a § 510 claim by a fully vested employee is *Dister v. Continental Group, Inc.*, 859 F.2d 1108 (2d Cir.1988). That case involved a plaintiff whose "basic pension rights had vested prior to his termination." *Id.* at 1110. The Second Circuit nonetheless held that plaintiff could bring a § 510 claim for interference with his ability to earn additional benefits, which his early termination denied him, provided that he "prove more than the single fact that his termination precluded him from vesting into the [additional benefits plan]; he must demonstrate Continental's unlawful purpose in firing him." *Id.* at 1111.[5]

For these reasons, we think that § 510 should not be given a narrow reading and instead hold that § 510 extends to claims by vested employees for intentional interference with their ability to accrue additional benefits. *Accord Kross*, 701 F.2d at 1242; *Clark*, 854 F.2d at 770–71 (assuming, without deciding, that § 510 right to sue extends to vested employees); *Nemeth v. Clark Equip. Co.*, 677 F.Supp. 899, 907–08 (W.D.Mich.1987); *Garry v. TRW, Inc.*, 603 F.Supp. 157, 162–63 (N.D.Ohio 1985). *But see, e.g., Kelly v. Chase Manhattan Bank*, 717 F.Supp. 227 (S.D.N.Y.1989); *Moehle v. NL Indus., Inc.*, 646 F.Supp. 769, 779 n. 6 (E.D.Mo.1986); *Donohue v. Custom Management Corp.*, 634 F.Supp. 1190, 1197 (W.D.Pa.1986); *Corum*, 628 F.Supp. at 717.

## B

■ That such a claim under § 510 by a vested worker may lie does not, however, resolve whether Conkwright's particular

claim should survive a motion for summary judgment.

■ In considering that question, we have first to decide whether a § 510 plaintiff must prove specific intent by defendants to interfere with his pension rights. There is a division of authority on this, *compare, e.g., Dister*, 859 F.2d at 1111–13, *and Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3d Cir.1987) (requiring specific intent), *with, e.g., Furcini v. Equibank, NA*, 660 F.Supp. 1436, 1442 (W.D.Pa. 1987) (specific intent not expressly required). Addressing it as a question of first impression for this court, we find the requirement of specific intent the better view. ERISA is designed to prevent harassment and firing of employees "for the purpose of interfering with the attainment of any right to which [a] participant may become entitled...." 29 U.S.C. § 1140. As the Second Circuit put it, "ERISA does not guarantee every employee a job until he or she has fully vested into a company's benefit plan." *Dister*, 859 F.2d at 1111. Rather, ERISA guarantees that no employee will be terminated where the purpose of the discharge is the interference with one's pension rights. Consequently, it is necessary to separate the firings which have an incidental, albeit important, effect on an employee's pension rights from the actionable firings, in which the effect of the firing on the employer's pension obligation was a motivating factor in the firing decision. Otherwise, an employee could sue under § 510 for being negligently terminated, and that goes too far to vindicate the pension rights of employees. An effective way of making the necessary separation is to require plaintiffs to demonstrate specific intent on the part

---

5. In reaching that conclusion, the Second Circuit cited *Corum v. Farm Credit Servs.*, 628 F.Supp. 707, 718 (D.Minn.1986), for the proposition that a plaintiff must show more than "lost opportunity to accrue additional benefits" to sustain a § 510 claim. That is certainly correct, since, as discussed fully below, a plaintiff must show the employer's unlawful purpose in firing him. But it turns the proposition on its head to suggest that one can never sue under § 510 for unlawful denial of "opportunity to accrue additional benefits." One cannot sue for additional benefits *unless* one shows something more than

just lost opportunity—a plaintiff must show the employer's unlawful purpose. We find this reading of the Second Circuit's language the only fair reading of both its statement and its exhaustive treatment of the plaintiff's § 510 claim, a treatment which would have been unnecessary had § 510 not encompassed a claim by a fully vested employee. In this regard, we think *Corum* misinterprets the law and *Kelly v. Chase Manhattan Bank*, 717 F.Supp. 227 (S.D.N.Y.1989), errs when it relies on *Dister* to conclude that accrual of additional benefits is not a cognizable § 510 claim. *See id.* at 232.

of the employer to interfere with the employee's pension rights. *Accord Dister,* 859 F.2d at 1111 ("An essential element of plaintiff's proof under the statute is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510."); *Vogel v. Independence Federal Sav. Bank,* 728 F.Supp. 1210, 1225–26 (D.Md.1990) (using "the more rigorous standard" of specific intent).

Thus, to take advantage of § 510, one must prove a specific intent of the employer to interfere with an employee's pension rights. In seeking to prove specific intent, a claimant in the ERISA context confronts proof problems similar to those encountered by Title VII plaintiffs: employers rarely, if ever, memorialize their specific intent to act unlawfully. For that reason, other courts considering § 510 claims have borrowed the Title VII, *McDonnell Douglas* scheme of proof for the purpose of proof. *See Dister,* 859 F.2d at 1111–17 (discussing and approving district court's use of *McDonnell Douglas* system of proof for § 510 plaintiff); *Gavalik,* 812 F.2d at 851 (same). That was the path which the district court below took, and it is the right one to follow. We hold that the *McDonnell Douglas* scheme of presumptions and shifting burdens of production is appropriate in the context of discriminatory discharge claims brought under § 510 of ERISA.

■ Under the *McDonnell Douglas* scheme of proof, Conkwright's § 510 claim ultimately fails because he does not demonstrate a genuine issue on the matter of pretext. In fact, there is no evidence supporting Conkwright's claim of pretext other than the fact that his termination saved Westinghouse money. While plaintiff's termination probably did save Westinghouse money, this is not enough to carry the day. As a number of courts have recognized, it is not sufficient for an employee to allege lost opportunity to accrue additional benefits as evidence of the employer's specific intent to violate ERISA; rather, a plaintiff must adduce facts, which if taken as true, could enable a jury to iden-

tify unlawful intent from the other various reasons why an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent. *See Dister,* 859 F.2d at 1113.

Conkwright tries to save his claim by citing statements that Westinghouse sought to meet its "financial need" by terminating him, and that financial need necessarily includes pension costs. Conkwright's suggestion that Westinghouse acted illegally because it acted to save money proves too much. Under that reasoning, any actions by an employer that result in savings would be suspect. It is obvious that benefit costs make up a large amount of the costs of an employee to a company, and that pension rights are a substantial component of benefit costs, but these undeniable propositions are not sufficient standing alone to prove the requisite intent by the path of pretext. Here, Conkwright had no other proof, and summary judgment was therefore appropriate.

## IV

■ Conkwright also assigns error to the district court's granting of summary judgment to Westinghouse on his pendent state law claim for breach of an at-will contract. This claim turns on an interpretation of the employee manual that was issued and revised while Conkwright worked at Westinghouse. The manual was revised after Conkwright was hired to state expressly that no terms shall be construed by employees to constitute any terms of a contract. The language is rather clear, and the question before us is whether Westinghouse's post-hire amendment to the contract was effective under Maryland law.

Maryland recognizes implied contracts based on employee manuals, *see, e.g., Dahl v. Brunswick Corp.,* 277 Md. 471, 356 A.2d 221 (1976); *Staggs v. Blue Cross of Maryland, Inc.,* 61 Md.App. 381, 486 A.2d 798 (1985), but also holds that an express disclaimer in the manual defeats the finding of an implied contract. *Fournier v. United States Fidelity & Guaranty Co.,* 82 Md.App. 31, 569 A.2d 1299 (1990); *Casti-*

*glione v. Johns Hopkins Hosp.,* 69 Md. App. 325, 517 A.2d 786 (1986). The statement in the manual Westinghouse relies on—"The contents are not to be construed as a contract of employment"—meets the express disclaimer standard in *Fournier* and *Castiglione.*

Conkwright tries to escape the disclaimer's force by contending that since that provision was added to the manual after he joined, it should not apply to him. The essential contract question is thus whether additional consideration is required for enforcement of a manual issued after-hire. The Maryland courts have implicitly held that additional consideration is required, but have found the additional consideration in the employee's continuous work. The *Castiglione* court held:

> It may well be that the employee manual in effect at the time appellant's employment was terminated is not the same manual which was disseminated to her when she was first hired.... [But] the later manual would have superseded any earlier editions. By continuing to work for appellee after the new manual's issuance, appellant, by her conduct, impliedly would have assented to a modification of her employment agreement.

517 A.2d at 790 n. 4 (citations omitted).

This view comports with the expectations of employees and employers. All employees expect to be covered by the personnel policies of the company in existence at the time of their current work, not when they were hired twenty years ago, unless special benefits are expressly provided for. Moreover, an employer expects to treat all its employees according to the same basic benefit rules, and not apply a hodgepodge of rules based on the starting date of the employee.

We therefore hold that Maryland would find the disclaimer effective, and consequently Conkwright has no claim based on breach of an implied employment at-will contract.[6]

---

**6.** Plaintiff also makes a claim of abusive discharge. However, *Parlato v. Abbott Labs.,* 850 F.2d 203 (4th Cir.1988), holds that federal and state age discrimination laws preempt such torts. *Parlato* remains good law, and the claim is without merit.

V

For the foregoing reasons, we hold that the district court properly granted summary judgment against the claimant on each of his claims.

AFFIRMED.