Kimberly A. CUSTER, Individually and as natural guardian and next friend of Marc Custer, an infant, Plaintiff–Appellant,

v.

PAN AMERICAN LIFE INSURANCE COMPANY; National Insurance Services, Incorporated, Defendants–Appellees.

No. 92–2570.

United States Court of Appeals, Fourth Circuit.

Argued July 14, 1993.

Decided Dec. 17, 1993.

Jeffrey Alan Holmstrand, Bachmann, Hess, Bachmann & Garden, Wheeling, WV, argued (Lester C. Hess, Jr., Bachmann, Hess, Bachmann & Garden, on the brief), for plaintiff-appellant.

Sandra K. Law, Schrader, Byrd, Byrum & Companion, Wheeling, WV, argued (James F. Companion, Yolonda G. Lambert, Schrader, Byrd, Byrum & Companion, on the brief), for defendants-appellees.

Before NIEMEYER, HAMILTON, and WILLIAMS, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

Kimberly A. Custer sued Pan American Life Insurance Company and National Insurance Services, Inc., the providers to Custer's employer of a group health insurance policy for the benefit of Custer and her fellow employees, claiming that Pan American Life and National Insurance wrongfully denied her health benefits. In particular, she alleged that they wrongfully refused to cover expenses for a cesarean section operation and to provide benefits to her son who was born with spina bifida and hydrocephalus. The district court, deciding the claim under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*, entered summary judgment in favor of the defendants, concluding that the defendants did pay all claimable benefits until the date when the policy was terminated by Custer's employer, and that they are not required to provide benefits beyond the termination of the policy, as argued by Custer. Having fully considered all of the arguments raised on appeal, we affirm.

## I

Kimberly Auber Custer was a beneficiary of a group health and life policy provided by her employer, Ohio Valley Candy Company. Ohio Valley Candy was a small, closely-held company, and Custer's father, John Auber,

was its president. Auber arranged for the policy through James Arritt, the company's insurance broker, who obtained the policy from National Insurance as administrator, and Pan American Life as underwriter. National Insurance is a wholly owned subsidiary of Pan American Life. The policy afforded no maternity benefits and did not cover preexisting conditions. It did, however, afford coverage to newly born family members without proof of medical eligibility, so long as written notice of the child's birth was provided within 31 days of the birth.

Before subscribing to the group policy, Custer became pregnant, and she so notified National Insurance at the time she subscribed. Toward the end of her pregnancy, it became apparent that a cesarean section would be required to deliver the baby. According to Custer, she advised Arritt of this fact, and Arritt told her that expenses for the surgery would be covered by the policy.

On October 21, 1988, Custer gave birth to a son, Marc Custer. Marc was born with spina bifida and hydrocephalus, conditions which require continuous and expensive medical attention. Arritt notified National Insurance of Marc's birth, orally and by two letters, for the purpose of triggering coverage without proof of eligibility. For some unexplained reason, the first letter dated November 11, 1988, was not received by National Insurance until March 27, 1989. When Arritt inquired about the letter in late November 1988 and learned that it had not been received, he sent a follow-up letter, dated December 2, 1988. All parties agree that this second letter was received on December 5. Asserting that both letters were received after the 31-day grace period following Marc's birth and that no proof of medical eligibility was submitted, National Insurance denied medical benefits to Marc. Medical benefits were also denied to Custer for her pregnancy, including coverage for the cesarean section.

Custer filed suit against National Insurance and Pan American Life in state court, claiming coverage for herself on the basis of the oral assurances given by Arritt, and for Marc, alleging that National Insurance did receive actual notice of his birth within 31 days. The state law claims were based on West Virginia common law and statute.

Shortly after Custer filed suit and before the defendants responded, Ohio Valley Candy canceled its policy with National Insurance and Pan American Life. Custer claims that John Auber canceled the policy because of his frustration with the way National Insurance and Pan American Life administered the policy. After the cancellation, the defendants admitted liability for benefits for Marc up to the date of cancellation and paid them.

The defendants removed the state court action to federal court, alleging that ERISA preempted the claims, and once in federal court, they filed a motion for summary judgment. They asserted that they had paid all obligations incurred for Marc up to the date of the cancellation and should not be held responsible for expenses incurred after cancellation. They also argued that the policy clearly excludes Custer's childbirth expenses and that under ERISA, Arritt's oral representation about coverage could not be enforced as a modification to the written policy. The district court did not rule on the merits of these claims but dismissed the complaint, reasoning that the plaintiff's state law claims were preempted by ERISA. The district court, however, granted plaintiff 30 days in which to file an amended complaint.

In her amended complaint, Custer abandoned her claims for maternity benefits but pursued claims on behalf of Marc for future benefits, even though the policy under which the claims were made had been canceled by her employer. She alleged that the defendants wrongfully interfered with her attainment of future rights in violation of 29 U.S.C. § 1140; that because the defendants knew that the denial of Marc's claim was wrongful, they should be equitably estopped from relying on the cancellation of the policy; and that they had constructively terminated the policy before her employer's cancellation by refusing to cover Marc. Even though Custer received some of the same benefits from her husband's insurance company that she was claiming from National Insurance and Pan American Life, she argued also that the coordination of benefits clause in the policy with

National Insurance and Pan American Life did not apply to prevent double payment.

After the parties filed status reports in the litigation, the court entered an order directing the defendants to file their motion for summary judgment by July 31, 1992, which they said they intended to file, and ordering the plaintiff to respond in accordance with Local Rule 2.07. On July 14, 1992, the defendants filed a paper entitled, "Memorandum of Law in Support of Defendant's Motion for Summary Judgment," and in the memorandum they claimed entitlement to summary judgment on all counts. The defendants did not, however, file a separate paper making a formal motion for summary judgment. Custer filed no response to this "memorandum." Several months later, on October 7, 1992, the defendants filed a formal motion for the entry of summary judgment under Local Rule 2.07 on the basis that no response had been filed to their earlier paper. Again, Custer filed no response. On November 12, 1992, over a month later, the district court entered summary judgment for the defendants, relying both on Custer's failure to comply with Local Rule 2.07 and on the merits of the defendants' position. On the merits, the court concluded that the defendants had made all payments required by the policy before it was terminated and that they were not required to provide benefits beyond termination. The court also denied Custer attorney's fees and refused to disregard the coordination of benefits provision within the policy. This appeal followed.

## II

Pan American Life and National Insurance argue that we need not reach the merits of this case because Custer failed to respond to their motion for summary judgment filed in the district court, and, under the district court's local rule, she should be "deemed not to oppose" the motion.[1] Although the district court *did* reach the merits of the summary judgment motion, it also relied on the

local rule as a ground to support its judgment. Pan American Life and National Insurance read Rule 2.07(d) to embody a default principle for application to motions under Federal Rule of Civil Procedure 56. They maintain:

> It is therefore, inconsistent and inappropriate for the plaintiff to raise on the instant appeal any issues which were ruled upon by the district court which concurred with the positions raised in the defendants' memorandum for summary judgment (since the plaintiff was deemed not to oppose these positions).

Relying on this default concept, they urge us to dismiss the appeal "on procedural grounds." We decline the invitation, however, because we believe that defendants' position misconstrues the summary judgment practice under Rule 56.

Default is a concept developed in the first instance from the failure of a defendant, who has been served, to appear in response to a writ of summons and to defend. When a complaint is filed, a summons issues for service on the defendant, requiring the defendant "to appear and defend" and providing notice that the defendant's failure to do so will result in judgment by default "for the relief demanded in the complaint." See Fed. R.Civ.P. 4(b). The admonition is backed by a procedure for entering a default judgment, described in Federal Rule of Civil Procedure 55. While these principles are explicitly adopted in other rules, *see, e.g.,* Fed.R.Civ.P. 16(f) and 37(b)(2)(C), they do not govern the failure of a plaintiff to respond to a defendant's motion for summary judgment. If the court were to determine that the plaintiff's failure to respond constituted a failure to prosecute, then it could dismiss the action. *See Link v. Wabash Railroad Co.,* 370 U.S. 626, 629–30, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962) (dismissing under the court's inherent power); *Davis v. Williams,* 588 F.2d 69, 70 (4th Cir.1978) (dismissing

---

1. Local Rule 2.07(d), Northern District of West Virginia, provides:

 Any party opposing any motion shall file two (2) copies of a responsive brief, together with any opposing affidavits, deposition transcripts

 or other documents, within fifteen (15) days after service of the movant's brief. *Any respondent who fails to comply with this rule shall be deemed not to oppose such motion.* (Emphasis added).

under Fed.R.Civ.P. 41(b)). But that was not what the district court purported to do here.

■ In this case, the plaintiff failed to respond to the defendants' motion for summary judgment, despite repeated notices to do so. This failure to respond, however, does not fulfill the burdens imposed on moving parties by Rule 56. Section (c) of Rule 56 requires that the moving party establish, in addition to the absence of a dispute over any material fact, that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to "a judgment as a matter of law." The failure to respond to the motion does not automatically accomplish this. Thus, the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law. This duty of the court is restated in section (e) of the rule, providing, "if the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added).

Pan American Life and National Insurance direct our attention to the portion of Local Rule 2.07 of the district court that provides that a party "who fails to comply with the rule shall be deemed not to oppose such motion." While that rule might arguably be read, out of context, to authorize the entry of a default summary judgment, when read together with Federal Rule of Civil Procedure 56, as it must be, the local rule can only be construed to provide an admonition to parties who fail to oppose motions for summary judgment. To adopt an interpretation of Local Rule 2.07 that is inconsistent with our reading of Rule 56 would yield a result prohibited both by statute and rule. *See* 28 U.S.C. § 2071 (mandating that court rules remain consistent with general rules of practice and procedure); Fed.R.Civ.P. 83 (same).

Nevertheless, because the district court also reached the merits of the motion for summary judgment, in addition to relying on Local Rule 2.07, we proceed to consider the merits of the issues raised by Custer on appeal.

## III

Custer contends that the district court erred in finding that her state law claims were preempted by ERISA. She contends (1) that the group health policy obtained by Ohio Valley Candy is not a "plan" as defined by ERISA so as to bring it under ERISA's regulation; (2) that Congress did not intend the Act to preempt claims against non-fiduciaries because ERISA provides no remedies against nonfiduciaries; and (3) that in any event, her claims are saved from preemption by virtue of 29 U.S.C. § 1144(b)(2)(A) (exempting from preemption state laws that regulate the insurance business). She argues, therefore, that her state law claims should not have been dismissed, and that she should not have been required to make her claims under ERISA. We address these contentions in order.

### A

■ Custer contends that Ohio Valley Candy's bare purchase of health insurance, without more, does not establish an ERISA plan. As she correctly observes, if no ERISA plan were involved, then the district court would have improperly caused her to drop her state law claims. She relies on *Taggart Corp. v. Life & Health Benefits Admin., Inc.,* 617 F.2d 1208 (5th Cir.1980) (holding that small proprietors' collective purchase of health benefits from a multiple employers' trust does not establish a plan under ERISA), *cert. denied sub nom., Taggart Corp. v. Efros,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).

■ When the factual circumstances are undisputed, as they are on this issue, whether the facts suffice to demonstrate the existence of a plan as defined by ERISA is a question of law to be reviewed *de novo. See, e.g., Peckham v. Gem State Mutual,* 964 F.2d 1043, 1047 n. 5 (10th Cir.1992).

With few exceptions not relevant here, ERISA applies to all employee benefit plans that are established or maintained by an employer "engaged in commerce or in any industry or activity affecting commerce," an employee organization, or both. 29 U.S.C. § 1003(a). While a plan may address *welfare* benefits or *pension* benefits, an employee welfare benefit plan is defined as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits....

29 U.S.C. § 1002(1). However, the purchase of every insurance policy does not automatically establish a welfare benefit plan under ERISA. The Department of Labor has issued regulations stating that if the employer merely facilitates the purchase of a group insurance policy paid for entirely by the employees, the employer is not establishing a plan. *See* 29 C.F.R. § 2510.3–1(j).[2] There must be some payment and manifestation of intent by the employer or employee organization to provide a benefit to the employees or the employees' beneficiaries of the type described in 29 U.S.C. § 1002(1). The existence of a plan may be determined from the surrounding circumstances to the extent that a "reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982) (*en banc*). Thus, for ERISA to apply, there must be (1) a plan, fund or program, (2) established or maintained (3) by an employer, employee organization, or both, (4) for the purpose of providing a benefit, (5) to employees or their beneficiaries. *See Donovan*, 688 F.2d at 1371. In addition, the statute explicitly states that the establishment of a plan may be accomplished through the purchase of insurance. *See* 29 U.S.C. § 1002(1).

The circumstances that existed at Ohio Valley Candy, which are not in controversy, demonstrate that an ERISA plan was established by the company. The group insurance policy was obtained by Ohio Valley Candy at the direction of its president for the benefit of the company's employees. The company determined the benefits to be provided by the policy, negotiated the terms of the policy, and paid for one-half of the costs. The policy itself provides procedures for making claims and obtaining benefits. Moreover, when the employer became dissatisfied with Pan American Life and National Insurance during this dispute, it made the decision to cancel the policy and to obtain a replacement policy. Furthermore, the policy benefits thus obtained by the employees were of the type defined in 29 U.S.C. § 1002(1) (medical, surgical, hospital care). Finally, the benefits were provided to the employees by reason of their employment relationship to the company, and the employees were fully aware of the benefits, each having been provided with a summary and having paid for one-half of the costs.

Custer's reliance on *Taggart* to suggest otherwise is misplaced. In *Taggart*, where a group of small proprietors purchased health insurance for *themselves* as a group to realize the purchasing power of a larger purchaser,

2. The regulation provides more completely as follows:

> (j) *Certain group or group-type insurance programs.* For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which
> (1) No contributions are made by an employer or employee organization;
> (2) Participation [in] the program is completely voluntary for employees or members;
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

**418**

the court concluded that the *"bare"* purchase of health insurance did not establish a plan, and that the group, operating essentially like a mutual fund, was not an employer. This narrow reading of *Taggart* has been confirmed by subsequent holdings. *See, e.g., Kidder v. H & B Marine, Inc.,* 932 F.2d 347, 353 (5th Cir.1991) (accepting *Taggart* as precedent only to the extent that it involved businesses or corporations with single persons who sought to establish a multiple employer trust to provide insurance for themselves and their families); *Donovan,* 688 F.2d at 1375 (limiting *Taggart*'s precedential effect to the idea that ERISA "does not regulate purchases of health insurance when there is no welfare plan").

 While the simple purchase of insurance alone may not establish a plan, it may be evidence of the existence of a plan if the other statutory criteria are met. We hold that in the circumstances of this case, an employee welfare benefit plan was unquestionably established by Ohio Valley Candy.

**B**

 Both parties have assumed, for purposes of arguing the scope of ERISA's preemption, that neither Pan American Life nor National Insurance is a fiduciary.[3] Custer argues that since there is no remedial provision in ERISA under which to redress claims against nonfiduciaries and since Congress' intent in enacting ERISA was to protect plan beneficiaries, Congress surely could not have intended to leave beneficiaries without an action against nonfiduciaries. Accordingly, she maintains that her state law actions against nonfiduciaries are not preempted.

 It is frequently observed that the force of ERISA's preemption is strong and its scope wide. *See, e.g., FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 407–08, 112 L.Ed.2d 356 (1990) ("The pre-emption clause is conspicuous for its breadth."). Congress clearly intended to occupy the field and to exclude from the field any effort by the states to regulate ERISA matters. ERISA's preemption clause states:

> Except as provided in subsection (b) of this section, the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....

29 U.S.C. § 1144(a).[4] The initial analytical step in resolving the question of preemption, therefore, is to address whether the purported claim *relates* to any employee benefit plan. *See Pilot Life Insurance Company v. Dedeaux,* 481 U.S. 41, 45, 107 S.Ct. 1549, 1551–52, 95 L.Ed.2d 39 (1987). The phrase "relates to" is given a broad, common-sense meaning—"[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–900, 77 L.Ed.2d 490 (1983). In this case, all of Custer's claims amount to a demand for past and future health care benefits from an ERISA plan. Since these are claims that "relate" to a "plan," they fall within the scope of ERISA's preemptive provisions. *See* 29 U.S.C. § 1144(a).

Custer's contention that the defendants may be nonfiduciaries or that ERISA provides no remedy against nonfiduciaries, leaving a gap, is, in our view, immaterial to the resolution of this issue. The Act's preemp-

---

**3.** The assumption that neither Pan American Life nor National Insurance is a fiduciary stands on the disclaimer in the group policy which provides, "neither NIS [National Insurance], the Trustee, nor the insurer is acting as a 'Sponsor,' nor are they deemed to be a 'named fiduciary' or 'Plan Administrator' as defined in [ERISA]." We question whether this assumption may be made without looking at the functions that they perform. The Act provides that anyone exercising discretionary authority or control respecting the plan's management, administration, or assets is an ERISA fiduciary. See 29 U.S.C. § 1002(21)(A). As the Supreme Court observed

in *Mertens v. Hewitt Assocs.,* —— U.S. ——, ——, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993), the concept of a fiduciary under ERISA is broader than the common law concept of a trustee. Because we conclude, however, that the preemption analysis is not dependent upon the answer to the question of whether Pan American Life and National Insurance are fiduciaries, we do not decide the issue here.

**4.** To the extent that subsection (b) might provide an exception to the preemptive scope of ERISA, we discuss that in Part III(C), below.

tion clause does not place the analysis on whether remedies are provided by the Act, but rather on whether the action *relates* to any employee benefit plan. In *Mertens v. Hewitt Assocs.*, —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), where an argument was made similar to that presented here, the Supreme Court seemed to assume, without expressly deciding, that claims against nonfiduciaries would be preempted. The Court observed, however, that in order to expand the relief available under ERISA to include remedies against nonfiduciaries, more was needed than the general notion that ERISA was intended to protect beneficiaries. *See id.* —— U.S. at ——, 113 S.Ct. at 2071. Furthermore, the Court observed that in light of the more expansive notion of fiduciary and the remedies which ERISA does provide, the gap in remedies against nonfiduciaries may not be as great as was alleged. "All that ERISA has eliminated, on these assumptions, is the common law's joint and several liability, for *all* direct and consequential damages suffered by the plan, on the part of persons who had no real power to control what the plan did." *Id.* —— U.S. at ——, 113 S.Ct. at 2072. While the majority did not find it necessary to decide whether claims against nonfiduciaries were preempted, Justice White stated in his dissent that while the majority chose not to reach the preemption question, "it is difficult to imagine how any common-law remedy for the harm alleged here—participation in a breach of fiduciary duty concerning an ERISA-governed plan—could have survived enactment of ERISA's 'deliberately expansive' preemption provision." *Id.* —— U.S. at ——, 113 S.Ct. at 2074 n. 2 (White, J., dissenting) (citation omitted). For purposes of deciding the issue before us, we agree with this observation.

All other courts of appeals that have considered the question agree that state causes of action asserted against nonfiduciaries are preempted by ERISA. They disagree only on the extent to which ERISA provides its own remedies against nonfiduciaries. *See Consolidated Beef Industries, Inc. v. New York Life Insurance Company,* 949 F.2d 960, 964 (8th Cir.1991) (whether defendant is a fiduciary does not affect the preemption anal-

ysis), *cert. denied,* —— U.S. ——, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992); *compare Gibson v. Prudential Ins. Co.,* 915 F.2d 414, 417–18 (9th Cir.1990) (actions against nonfiduciaries preempted, in part, because ERISA provides for equitable relief against nonfiduciaries under 29 U.S.C. § 1132(a)(3)), *with Howard v. Parisian, Inc.,* 807 F.2d 1560, 1564–65 (11th Cir.1987) (that Congress did. not provide for relief against nonfiduciaries does not alter the principle that state law actions against nonfiduciaries are preempted).

We hold that the generalized contention that there should be some form of action available against nonfiduciaries is insufficient to overcome the specific language of the statute which provides for preemption of any claim that relates to an employee benefit plan. We do not now reach the question of the extent to which redress against a nonfiduciary is available under ERISA itself, concluding only that ERISA preempts Custer's state law claims in this case.

### C

■■■■ Custer contends that if the preemption clause of 29 U.S.C. § 1144(a) applies, so does the savings clause in § 1144(b)(2)(A), saving from preemption any law regulating insurance. Section 1144(b)(2)(A) provides that ERISA's preemption clause shall not be construed "to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." Custer argues that her state law claim alleged in Count III, based on West Virginia's unfair trade practices, W.Va.Code § 33–11–4(9) (defining unfair settlement practices as an unfair trade practice), is saved from preemption as arising under a law that regulates insurance. Count III had alleged that the defendants "have been negligent, careless and irresponsible in their handling of the Plaintiffs' claims under the policy."

Because a claim that is preempted by 29 U.S.C. § 1144(a) may still fall within the savings clause of § 1144(b)(2)(A), we must therefore determine whether the state law involved purports to regulate the business of insurance. To that end, the Supreme Court

has adopted a test developed under the McCarran–Ferguson Act: " '[F]irst, whether the practice has the effect of transferring or spreading a policyholder's ; risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.' " *Metropolitan Life Insurance Company v. Massachusetts,* 471 U.S. 724, 743, .105 S.Ct. 2380, 2391, 85 L.Ed.2d 728 (1985) (quoting *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008–09, 73 L.Ed.2d 647 (1982)).

Applying that test in a later case to the question of whether ERISA preempted a common law tort and contract action under Mississippi law for "improper processing of a claim for benefits," the Supreme Court concluded that § 1144(b)(2)(A) did not save the claim from preemption. *Pilot Life,* 481 U.S. at 48, 107 S.Ct. at 1553. The Court reasoned that such actions are not directed at the insurance industry alone and do not relate to the spreading of risk. *Id.* at 50, 107 S.Ct. at 1554. The Court thus concluded that a state cause of action for improper claim processing filed. against an insurer is not saved from preemption under § 1144(a). *Id.* at 54, 107 S.Ct. at 2862–63. *See also Powell v. Chesapeake & Potomac Telephone Co.,* 780 F.2d 419, 423–24 (4th Cir.1985), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986) (concluding, in a case decided before *Pilot* but consistent with it, that an action alleging improper claims processing is not saved from preemption because it does not regulate the business of insurance under ERISA). Controlled by *Pilot Life* and *Powell,* we hold that Custer's claims under West Virginia law relating to improper claims processing or administration are not saved from preemption by the savings clause. *See also Ball v. Life Planning Services, Inc.,* 187 W.Va. 682, 421 S.E.2d 223, 227 (1992) (holding that an action under subsection (9) of W.Va.Code 33–11–4 is preempted under ERISA); *DeBruyne v. Equitable Life Assur. Soc'y of the United States,* 920 F.2d 457, 470 (7th Cir.1990) (misrepresentation claim under New York insurance law is not within the scope of the savings clause); *Ramirez v.*

*Inter–Continental Hotels,* 890 F.2d 760, 763–64 (5th Cir.1989) (same for Texas law prohibiting unfair competition or practices in the insurance business); *Kanne v. Connecticut Gen. Life Ins. Co.,* 867 F.2d 489, 494 (9th Cir.1988) (same for California action for mishandling a claim); *In ·re Life Ins. Co. of North America,* 857 F.2d 1190 (8th Cir.1988) (same for vexatious refusal to pay claim under Missouri statute); *Anschultz v. Connecticut Gen. Life Ins. Co.,* 850 F.2d 1467, 1469 (11th Cir.1988) (same for Florida state law allowing claim for breach of a plan).

## IV

Having concluded that Custer's state law claims are preempted by ERISA, we now turn to the merits of her amended complaint alleging claims under ERISA, which the district court dismissed on defendants' motion for summary judgment.

Custer alleges in her amended complaint that by refusing to add Marc Custer as an insured, Pan American Life and National Insurance "discriminated against the plaintiffs for exercising a right to receive benefits in violation of 29 U.S.C. § 1140." She also alleges that because the refusal to add Marc as an insured was improper, the defendants should be "equitably estopped" from relying on the termination of the policy by Ohio Valley Candy. She urges us to develop federal common law to accommodate her claims. Finally, she alleges that the refusal to add Marc and to pay his claims as presented amounted to a constructive termination by Pan American Life and National Insurance of the policy, entitling Marc to continued individual coverage under COBRA, 29 U.S.C. § 1161, *et seq.*

▮▮▮ Pan American Life and National Insurance contend that Custer cannot bring an action against them under 29 U.S.C. § 1140 because neither of them is her employer, and § 1140, they argue, imposes liability only on an employer. Even if an action under § 1140 is available, they maintain, Custer's claims amount to nothing more than a claim for benefits. Since Custer has been paid all of the benefits to which she and her son are entitled under the plan, they contend that

ERISA imposes no further obligation, including no continuing obligation to provide benefits after Custer's employer terminated their policy.

 We address first whether the scope of 29 U.S.C. § 1140 includes claims against persons other than the employer. Section 510 of ERISA provides:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled to under the plan....

29 U.S.C. § 1140. This section, enforced through § 1132(a)(3), provides a companion to § 1132(a)(1), which provides actions to recover benefits or clarify rights. Together, these provisions protect "rights about to be earned but frustrated due to unlawful employer action, benefits earned but not paid, other rights due a participant but not fulfilled, and future benefits earned but not yet due." *Conkwright v. Westinghouse Electric Corp.*, 933 F.2d 231, 237 (4th Cir.1991). The defendant in *Conkwright* was the employer, and, indeed, the primary purpose behind § 1140 is to prevent an employer from taking action against an employee. *See id.*

 As written, however, 29 U.S.C. § 1140 states that the proscribed actions are unlawful "for any *person*." (Emphasis added). Since both terms, "employer" and "person," are defined by ERISA, *see* 29 U.S.C. § 1002(5) and (9), we must assume that Congress used the term "person" deliberately. Although the verbs used in § 1140, such as "discharge," "suspend," or "discipline," may suggest action by an *employer*, Congress also used broader verbs, such as "discriminate," and the much broader term "person," in stating by whom such actions would be illegal. In light of the plain language of the section, we cannot agree with the defendants that Congress intended to limit those who could violate § 1140 to employers. *See Tingey v. Pixley–Richards West, Inc.*, 953 F.2d 1124, 1132 n. 4 (9th Cir.1992). Because the definition of "person" includes a corporation, mutu-

al company, or association, *see* 29 U.S.C. § 1002(9), we reject the argument of Pan American Life and National Insurance that they are not within the class of persons to which § 1140 was directed.

 Nevertheless, it is readily apparent that Custer's claims do not fall under 29 U.S.C. § 1140 but spring from the single scenario that Pan American Life and National Insurance initially refused to pay any benefits and later paid some. While Custer alleges that this was a calculated maneuver designed to frustrate her benefits and to cause her employer to cancel the policy, the record does not support her contention. On the contrary, the communications between the parties are rational and entirely responsive to the existing coverage problems. Custer first claimed maternity benefits, even though the policy had no provision for them and her pregnancy was a preexisting condition. While she later acknowledged no right to these benefits and abandoned her claim, Custer nevertheless made the claim at the outset, which required National Insurance to deny her benefits, based on the express terms of the policy. When Custer made a claim for Marc, National Insurance likewise refused benefits and again invoked the terms of the policy, namely on the basis that Marc would not be covered without medical eligibility unless the company received notice of his birth within 31 days of his birth. Since Custer could not establish medical eligibility, the company rationally denied the claim. While there is some factual question about whether Custer provided oral notice within the 31–day period through her employer's agent, no one has disputed that National Insurance received its first written notice on December 5, 1988, well beyond the 31–day period. While we do not need to resolve this factual question, we can say that we have found no evidence that, in denying those claims, National Insurance acted with the purpose of causing the employer to cancel the policy.

Custer notes that Pan American Life and National Insurance did not pay benefits for Marc until the policy was canceled, and once it was canceled, they paid all benefits due. This conduct, they argue, supports the infer-

ence that Pan American Life and National Insurance were admitting that they erroneously denied coverage for Marc in the first place and that they deferred payment for some economically advantageous reason. The record, on the contrary, reveals the reason for denying Marc's benefits—a lack of notice—and provides no evidence of a bad faith pretext. In these circumstances, we affirm the district court's conclusion that Custer fell short of establishing a viable claim under 29 U.S.C. § 1140 and failed to establish any right to continuation of coverage after her employer canceled.

■ Claims for health benefits under plans are made constantly, and decisions must be made as to which should be paid and which should be denied. An employer who is unhappy with the coverage provided by an insurer may cancel, and a participant or beneficiary who disagrees with the decision on a claim may bring an action under 29 U.S.C. § 1132(a)(1), seeking past benefits and clarification of future rights. A plaintiff must, however, show more than the mere denial of a claim to establish that an insurer has acted with the intent of interfering with a future right under 29 U.S.C. § 1140. We thus find no error in the district court's entry of summary judgment on the merits in favor of the defendants.

### V

■ Finally, Custer contends that the district court erred in refusing to award her attorney's fees under 29 U.S.C. § 1132(g)(1) which provides, "In any action under this title ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." Because it ruled against Custer on all contested matters, the district court refused to award attorney's fees. Custer argues, however, that because the defendants did not admit liability for benefits payable to Marc Custer *until after* she filed suit, she should be treated as a prevailing party and is therefore entitled to attorney's fees.

■ An award of attorney's fees under ERISA is discretionary, and our review of the district court's exercise of discretion is limited to determining whether it abused its discretion.

■ Turning to the applicable criteria for awarding a fee in an ERISA action, we have held that a party who prevails does not, by prevailing alone, establish a presumption of entitlement to an award of fees. *See Quesinberry v. Life Insurance Company of North America,* 987 F.2d 1017, 1028–29 (4th Cir. 1993) (*en banc*). In *Quesinberry* we expressly rejected the notion, prevalent in civil rights cases under 42 U.S.C. § 1988, that a prevailing party should ordinarily recover attorney's fees unless special circumstances would render such an award unjust. *Id.* Rather, we held that Congress intended such an award to be available, in the discretion of the district court, only for that particular case which the court determines is appropriate in light of several factors. Drawing from some of the factors listed in *Quesinberry,* we note that the court may consider the opposing party's degree of culpability or bad faith and the relative merits of the parties' positions; the extent to which an award against the opposing party would deter others from acting similarly; and the extent to which the moving party has benefited other participants and beneficiaries of the employee benefit plan. *Id.* at 1029. Moreover, we pointed out that no one of these or other factors may be decisive. The factors simply constitute the nucleus of an inquiry which seeks to identify that unusual case in which the judge may shift fees to further the policies of the statute. *Id.*

In this case, Custer seeks to qualify her case for such an award by reference to the single factor that the filing of her lawsuit prompted the defendants to pay Marc's benefits. To accept this argument would apply a presumption of entitlement based on the single fact that she prevailed on one issue, a basis which we have noted does not create a presumption of entitlement under § 1132(g)(1). She still would have to address the *Quesinberry* factors to show why the circumstances of this case justify fee shifting. Our quick application of the factors reveals that the district court's holding was fully justified.

Before suit was filed, Custer demanded plan benefits both for herself and for Marc. National Insurance, relying on the terms of the plan, denied her claims. On the claim for Custer, National Insurance relied on the fact that the plan did not provide maternity benefits and did not cover pre-existing conditions. On the claim for Marc, it relied on the fact that Marc had not been added to the policy in accordance with its terms, because it did not receive notice of his birth within 31 days. Both positions were legally justifiable, although the second was technical and disputed; and perhaps for that reason National Insurance paid Marc's benefits after it realized that the payment would be capped by the employer's termination of the policy. These facts, however, are not indicative of illegal or bad faith conduct. Surely, National Insurance's response was not conduct justifying a deterring sanction, and the righteousness of Custer's position was never firmly established. Moreover, Custer's success in obtaining benefits for Marc vindicated no other plan participant's rights.

Under the relevant factors for shifting fees under § 1132(g)(1), Custer simply has not made her case. She must demonstrate more than merely being the prevailing party on a single issue to demand entitlement to attorney's fees and to establish that the district court abused its discretion in refusing them.

## VI

In summary, we conclude that the insurance arrangement involved in this case constituted an employee welfare benefit plan and that ERISA applied, preempting actions under state law relating to the plan, even though the defendants may be nonfiduciaries. We further conclude that while an action under 29 U.S.C. § 1140 may be brought against any person, as that term is defined by ERISA, an inference that such a person has acted with the intent to interfere with a future right may not be drawn from the simple denial of a claim for benefits. Finally, we conclude that the denial of attorney's fees in this case was well within the discretion of the district court. For the reasons stated, the judgment of the district court is affirmed.

*AFFIRMED.*