John SINGLEY, Plaintiff,

v.

ILLINOIS & MIDLAND RAILROAD INC., Chicago & Illinois Midland Railway Co., and Genesee and Wyoming, Inc., Defendants.

No. 98–3028.

United States District Court, C.D. Illinois, Springfield Division.

Jan. 24, 2001.

---

**1038**

Howard W. Feldman, Springfield, IL, for plaintiff.

A. Paul Britton, Rochester, NY, Dean W. Jackson, Springfield, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge.

Bench trial.

Having heard all of the testimony, reviewed the proffered exhibits, and considered all of the arguments presented in the parties' briefs, the Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. BACKGROUND

Plaintiff John Singley ("Plaintiff" or "Singley")filed this suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140 (Section 510) alleging that he was wrongfully discharged from his job for exercising rights under his retirement benefits plan.

He was initially employed by Chicago & Illinois Midland Railway Company ("C & IM") on April 4, 1972. Singley was continuously employed by C & IM until February 9, 1996, as an assistant superintendent/trainmaster and special agent for the company. After a change in ownership on February 9, 1996, C & IM changed its name to Illinois & Midland Railroad, Inc. ("I & M" or "Railroad"), which is a subsidiary of Genesee and Wyoming, Inc. ("G & W"). Despite the change in ownership, Singley continued to serve the new company in the same capacity.

On September 25, 1996, Singley filed a claim related to the Railroad's 401(k) plan. On September 15, 1997, the president and general manager of the Railroad met with Singley and advised him that his position was going to be eliminated, and offered to put him in another position. Singley declined the offer. The parties then negotiated a separation agreement ("Agreement") and executed the Agreement on October 21, 1997.

In the Agreement, Singley received $111,600.00, earned vacation pay of $7,303.46, a letter of reference, and participation in the company's 401(k) plan. In exchange, Singley relinquished all of his rights and privileges as an employee of the company. Included in paragraph 8 of the Agreement was the following clause:

By entering into this Agreement, Employee accepts the payments and benefits provided by it as full and complete satisfaction of and hereby agrees to release and waive all claims and never to commence, prosecute or cause to permit, advise or assist to be commenced or prosecuted any lawsuits, actions, charges or proceedings of any kind upon any claims, demands, causes or [sic] action, obligations, damages, or liabilities against the Company, and/or its predecessors (including the Chicago & Illinois Midland Railway Company), successors, related entities, officers, directors, shareholders, agents, attorneys, employees, assigns, heirs, executors and/or administrators related to the Company's employment of the Employee and/or termination of the Employee from employment with the Company, from the beginning of Employee's employment to and including the date of this Agreement. The Employee expressly states that he understands and agrees that he is waiving any rights he may have or now has

to pursue any and all remedies available to him, including, without limitation, any and all claims of age discrimination under the Age Discrimination in Employment Act, employment discrimination under Title VII of the Civil Rights Act of 1964, the 'Equal Pay Act of 1963, and the Illinois Human Rights Act, the Americans with Disabilities Act, as well as *any and all claims under laws relating to employment or employment rights, including those relating to his employment by the Company, separation from employment with the Company,* any representations or commitments made by the Company regarding future employment, benefits payable by the Company, and any and all claims relating to employment discrimination, and, including but not limited to, any and all claims under State contract or tort law, such as claims of wrongful discharge, negligent or intentional affliction of emotional distress and defamation, and any claims for attorneys' fees that exist or may exist as of the date of the signing of this Agreement. The Employee affirms that he has no claims under the Federal Employers' Liability Act (FELA) for on-the-job injury or occupational disease. *This Agreement and/or Release does not restrict any rights or privileges the Employee is entitled to by virtue of the Company's 401(k) plan and the Employee Retirement Income Security Act.* Nothing herein shall prevent Employee from enforcing the provision of this agreement [emphasis added].

Further, in paragraph 9 of the Agreement, Singley specifically waives his claim for benefits that he filed on September 25, 1996. The Agreement was signed by both parties and executed on October 21, 1997.

On February 9, 1998, Singley filed this complaint alleging that he was fired from his position in retaliation for filing the claim for benefits on September 25, 1996, in violation of 29 U.S.C. § 1140 of ERISA. Based on paragraph 8 and 14 of the Agreement, the Railroad raised affirmative defenses of release, waiver, and accord and satisfaction in its answer. Moreover, the Railroad filed a Cross–Motion for Summary Judgment on its affirmative defenses.

This Court denied the Railroad's motion, holding that the separation agreement specifically excepted all rights under ERISA, on which this cause of action was based. The case proceeded to bench trial, and the Court heard testimony for approximately six days. This Order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT

This dispute stems from the 1996 asset purchase of the now defunct C & IM by the I & M—a subsidiary of G & W. Spencer White is the President of the new I & M and Raquel Swan was the Vice President of I & M at that time.[1] However, Swan continued to be an officer of C & IM and worked towards winding up all of the remaining business of C & IM, including the company's 401(k) plan. White was not an officer of C & IM, nor did he have supervisory power of Swan with respect to C & IM.

When the change in ownership took place, many former employees of the C & IM, including Plaintiff, were hired by the new I & M. Plaintiff's formal title at that time was Superintendent Trainmaster. Although many of the employees were members of the United Transportation Union ("UTU"), I & M did not adopt the collective bargaining agreement. As a result, there were detrimental changes in the work rules, one of which was the inability of the management to give set schedules to the trainmen. On September 26, 1996, Spencer White met with several union trainmen from the Transportation Department for about two hours. During the meeting, the employees complained about

---

**1.** Her current title is Executive Vice President and Assistant Secretary of I & M.

their supervisors, especially Plaintiff, and regarding the new work terms. White described the situation with the workers as "close to mutiny."

In the summer of 1996, Plaintiff had approached Raquel Swan and raised questions regarding the accuracy of the accounting of investment monies in his 401(k) account. Because the C & IM had ceased operations, it had become necessary to terminate the plan and distribute its assets. The G & W agreed to assist in administering the closing out of the C & IM 401(k) plans. In Springfield, Swan assisted with the termination of the plan. Throughout the next several months, Plaintiff approached Swan on several occasions with questions regarding his 401(k) plan. His complaint was that his account did not reflect certain gains. Swan was not able to provide satisfactory answers, and referred the issue to Sue Callan, a G & W administrator.

Plaintiff brought his concerns regarding his 401(k) plan and the way it was being handled to the attention of Spencer White at a morning meeting in the fall of 1996. White told Singley that if he had complaints with regard to the C & IM 401(k) plan, he should take it through the appropriate channels with the C & IM, and that it was not an I & M or G & W issue. On September 26, 1996, Singley filed a claim in the form of a letter to Swan. She referred the claim to G & W's pension counsel. Singley's claim and subsequent appeal were both denied.

In order to study the cause of the discord in the Transportation Department, White sought the help of Carl Belke in December of 1996. Belke worked for G & Y as a consultant. White wanted Belke to assist him in determining the cause of the problems in the Transportation Department and how to solve them. Belke was to head the Transportation Department on an interim basis and investigate the problems. His role was to make the necessary changes to correct the problems.

Belke discovered that severe problems did in fact exist in the department. He concluded that Singley did not work well with James Rodden, who had been Superintendent of the Transportation Department at the C & IM since 1975 and had been appointed to a similar position at the I & M. Singley reported to Rodden at the I & M. In January 1997, Singley was demoted. His new title was Manager of Rules, Safety, and Training. The result was that Singley would no longer have day-to-day line supervision authority.

In the spring of 1997, White and Belke began searching for Belke's replacement who would hold the title of Chief Transportation Officer. Singley expressed interest in and was interviewed for the position. However, he was not seriously considered. On July 1, 1997, Terry Holderread was hired for the post. White instructed Holderread to restructure the Transportation Department as he deemed necessary. He attempted to accomplish this primarily by conducting informal interviews with employees.

In July 1997, Singley expressed a desire to pursue MBA studies at the University of Illinois. He inquired of Holderread whether the I & M would reimburse him for this expense pursuant to company policy. Holderread deferred this decision to White. White determined that because Singley's future with the company was uncertain, the request should be denied.

Holderread considered the possibility of reducing the number of managers from three to two. He eventually determined that only two managers were needed. Holderread concluded that Singley's position should be eliminated. On September 12, 1997, Holderread advised White of his decision. White endorsed Holderread's recommendation. On September 15, White and Holderread met with Singley to inform him of the decision. Singley was told that his options were to exercise his seniority rights pursuant to the union agreement and remain with the railroad in

a union position[2] or to leave the railroad with a separation agreement. Singley chose the latter option. Pursuant to the agreement, Singley received $111,000 and a letter of recommendation.

## III. CONCLUSIONS OF LAW

Section 510 of ERISA provides in part:
It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan....

29 U.S.C. § 1140.

In enacting section 510, Congress' goal was to prevent " 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights' " or other benefits. *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir.1991) (quoting *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 237 (4th Cir.1991)). Section 510 of ERISA therefore protects employees from dismissal by employers who attempt to limit costs of benefit plans by preventing a party from using the benefits. *See Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir.1998).

■ To prove a violation of section 510, a plaintiff must show more than a loss of benefits; he must establish that his employer terminated him with the specific intent of preventing or retaliating for complaining about his benefits. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 642 n. 3 (7th Cir.1995) (holding that "a plaintiff in an ERISA action must demonstrate that the employer had the 'specific intent' to violate the statute."); *see also Teumer v. General Motors Corp.*, 34 F.3d 542, 550 (7th Cir.1994) ("A plaintiff seeking relief under § 510 must establish that the complained of action affecting his employment

situation was taken by his employer with the specific intent of interfering with his benefit rights."). " '[N]o action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination.' " *Meredith v. Navistar Int'l Trans. Corp.*, 935 F.2d 124, 127 (7th Cir.1991) (quoting *Dytrt v. Mountain State Telephone and Telegraph Co.*, 921 F.2d 889, 896 (9th Cir.1990)).

■ A plaintiff may meet his burden by presenting direct evidence of the interference with his protected benefits or by utilizing the familiar burden-shifting method articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Little*, 71 F.3d at 642; *see also Salus v. GTE Directories Service Corp.*, 104 F.3d 131, 135 (7th Cir.1997). In the section 510 context, the burden-shifting approach requires that a plaintiff establish a prima facie case by showing the following: (1) He belongs to the protected class; (2) He was qualified for the position; and (3) He was discharged or denied employment in such a manner that there is a basis for believing that the specific intent to retaliate was present. When the plaintiff has established a prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the challenged action. *See Salus*, 104 F.3d at 135. If the defendant offers a legitimate reason for the challenged action, the burden once again shifts back to the plaintiff who then must show that the proffered reason is pretextual and that the "motivating factor behind the termination" was the specific intent to interfere with the plaintiff's ERISA rights. *See Meredith*, 935 F.2d at 127.

## IV. ANALYSIS

### A. Specific Intent

■ In short, the Court finds that Defendants did not have the specific intent of

2. Because of his many years of employment with the C & IM, Singley was entitled pursuant to the union agreement to exercise his

seniority rights and assume another position with the I & M, displacing an employee with less seniority.

interfering with Plaintiff's benefit rights. There are basically three instances in which the Railroad took an adverse employment action against Plaintiff: (1) In January of 1997 when Plaintiff's title changed to Manager of Rules, Safety and Training; (2) When Plaintiff was denied participation in the University of Illinois Executive MBA program; and (3) When his position was eventually eliminated. Plaintiff has failed to present evidence that Defendants had the specific intent of interfering with Plaintiff's benefit rights in any of those instances. Hence, Plaintiff has failed to present a prima facie case. *See Salus*, 104 F.3d at 135. Moreover, Defendant has in any event advanced legitimate, non-discriminatory reasons for the adverse employment action that was taken. Plaintiff has failed to demonstrate that these proffered reasons offered by Defendants were pretextual.

By September 1996, it had become clear that there were serious morale problems in the Transportation Department. This was brought to Spencer White's attention after train engineers Charles McQuern and Kathleen Guy requested that he meet with train and engine service employees. The evidence clearly indicated that Singley and James Rodden did not work well together as a team. There were instances in which the two managers counteracted each other and reversed each other's decisions. Moreover, it was clear that Rodden and Singley failed at times to treat the employees under their command with respect. This was particularly true of Singley. More than one employee recalled instances in which Singley had exercised his authority in an arbitrary and belittling manner. Nonetheless, both Rodden and Singley denied that there were any problems in the department.

As the Court found before, White hired Belke in late 1996 to investigate and to remedy what he viewed as discord in the Transportation Department. White had concluded that he could not depend on either Singley or Rodden to address the problems in the department. After speaking with some of the employees, Belke felt that Plaintiff's management style was possibly one of the causes of the workers' frustrations, and decided to "experiment" by removing him from having direct day-to-day supervisory authority over the trainmen to see if that would alleviate the problems. This is when Belke decided to change Plaintiff's job description to Manager of Rules, Safety and Training. There is, however, no evidence to suggest that White hired Belke with the specific intent to retaliate against Plaintiff for complaining about his 401(k) plan. Moreover, although Belke knew there was a 401(k) problem, he did not know Plaintiff was one of the complaining employees.

In contrast, there is ample evidence in the record to show that Plaintiff was not a very personable manager and that this was the cause of the adverse employment action. White and Belke believed that Plaintiff's management style was contributing to the discord in the transportation department. Terry Holderread would later come to share this belief. Even if this given reason might be based on mistaken facts, the Court is not convinced that the preponderance of the evidence shows that Defendants demoted and fired or "terminated" Plaintiff with the specific intent to interfere with his 401(k) rights, or because Plaintiff filed a claim pertaining to the mismanagement of his pension plan assets.

The record supports Defendants' assertions that Plaintiff was demoted and subsequently terminated because of his shortcomings as a manager. Plaintiff makes much of Belke's comment after his demotion that Plaintiff might be restored to his old position if his "problem" went away, apparently contending that the problem was the appeal of his 401(k) claim. However, Belke was clearly referring to the complaints about Singley's managing style made by employees under his command. The most telling evidence of this is Singley's own notes of a meeting with Belke that took place on January 9, 1997:

I asked Carl how he would prove I was or was not the problem. He explained that I would be put to work on rule books and training with no interaction with the crews. If complaining ceases then I am the problem. I asked that if the complaining does not cease, would I get my job back. Carl said "we'll cross that bridge when we come to it." One would think that if I am not the problem, the company would want to correct their actions.

Thus, it is clear that the "problem" that Belke was referring to was Singley's managerial style, not the situation with his 401(k) plan.

Singley nevertheless sought to be considered for the position of Chief Transportation Officer, a position that eventually went to Holderread. Singley was not seriously considered for the position in part because of the manner in which he dealt with people. Holderread was given the authority to restructure the department as he saw fit. Nonetheless, Holderread deferred to White the decision of whether the I & M would reimburse Singley for the cost of MBA studies that he planned to pursue at the University of Illinois. Because Singley's future with the company was uncertain, White denied the request. One of the criteria used to determine whether the company would assist with educational expenses was whether the education would aid in career development. White informed Singley of his decision at a meeting on July 16, 1997. His notes of that meeting specifically referred to Singley's lack of ability in managing people and his "heavy handed management style." This is consistent with other evidence presented regarding Singley's managerial skills or lack thereof and with the results of Belke's investigation several months earlier. Moreover, it undermines Plaintiff's theory that the adverse action taken by the I & M was because of the filing of his 401(k) claim and subsequent appeal. Plaintiff is basically asking the Court to infer that the I & M was engaged in a nearly year-long process to retaliate against Singley because of the action he took regarding his 401(k). Absent any evidence of specific intent, the Court is unwilling to do this.

Plaintiff emphasizes that the atmosphere changed at work after he made the claim against the C & IM 401(k) plan for the gain he felt was deprived him. The claim was initially filed on September 25, 1996. Prior to that, Singley described his relationship with White as cordial and professional. Moreover, White gave no indication during this time that he was dissatisfied with Singley's work performance in any way. It was after he made the claim to Raquel Swan, the Plan Administrator, that he noticed his relationship with White had cooled off. However, it was on September 26, 1996—one day later—that several train employees met with White to discuss their concerns about the Transportation Department. The evidence shows that it was then that White learned of the seriousness of the problems within the department. In his trial brief, Plaintiff asserts that White called the meeting implying perhaps that the meeting was called in response to Singley having filed the claim the day before. However, several witnesses testified that the meeting was called by train employees Kathy Guy and Charles McQuern on behalf of other employees a week or two before September 26. The Court finds this testimony to be credible. Hence, it would have been impossible for this meeting to have been called in response to Plaintiff's having filed his claim the day before. Moreover, if Plaintiff noticed a "cooling off" in his relationship with White after September 26, the Court finds that this resulted because of the problems in the Transportation Department that he headed along with Rodden. Certainly, there is nothing other than speculation on the part of Plaintiff to suggest that White called the meeting with the specific intent of retaliating against him for having filed the claim.

Plaintiff also emphasizes the tension between he and Swan, describing their relationship as, at best, "strained but professional." In October 1996, Swan accompanied Carl Belke on a business trip to Chile to investigate a possible railroad acquisition. This was less than two months prior to Belke's arrival in Springfield at the Railroad to assist White with determining the source of the problems in the Transportation Department. Plaintiff seems to imply that while on the trip, Swan discussed with Belke the 401(k) situation with Plaintiff. However, Swan indicated that she did not recall discussing with Belke the I & M or the situation with Singley. Belke noted that although he was aware of the 401(k) problem, he did not recall discussing the situation with Swan. Plaintiff emphasizes that immediately prior to his meeting with Belke in which he learned of his demotion, Swan exited Belke's office. Apparently, Plaintiff is suggesting that Swan was discussing with Belke his imminent demotion because of the 401(k) situation. However, all of this is wild speculation on the part of Plaintiff. It certainly falls short of constituting specific intent to retaliate against Plaintiff for making the 401(k) claim.

Before going any further, it is important to consider the nature of Plaintiff's 401(k) claim. Essentially, Plaintiff filed the claim against the C & IM 401(k) plan on September 25, 1996, for the gain that he felt had been deprived him. On March 6, 1996, Swan had circulated a memorandum stating "[a]nyone who wishes to take a distribution from the C & IM Railway 401(K) Plan, please call me at 788-8612" along with a distribution form. Swan informed Plaintiff that he had the option of (1) Rolling his account over into the G & W plan; (2) Rolling it over into an IRA; or (3) Taking a cash payment and paying the applicable taxes. Plaintiff chose to roll his account over to the G & W 401(k) plan. On April 3, 1996, Plaintiff signed a form to take a distribution which he received on June 6, 1996. In August 1996, Plaintiff received a statement of his C & IM 401(k) account and discovered that it did not reflect any appreciation for most of the second quarter of 1996. A portion of Singley's 401(k) assets had been invested in a common stock growth fund. Despite the fact that the stock market had risen dramatically, the value of Plaintiff's 401(k) account had been frozen from the time that he took the distribution. Swan was not aware that the accounts would be frozen when a distribution was requested and had in fact signed a form to take a distribution herself shortly after Plaintiff. In any event, Swan referred the issue to others after Plaintiff continued to pursue the matter. Plaintiff had indicated that he had approximately $30,000 in a growth fund and that the stock market had risen approximately 14% while his account was frozen. Given this information, Plaintiff missed out on a gain of just over $4,000. A number of other employees expressed dissatisfaction when they found that their account values had been frozen. Swan referred these matters to those with expertise. Plaintiff was not satisfied with their explanations and filed a claim in the form of a letter to Swan. She in turn referred the matter to G & W's pension counsel. Plaintiff's claim was denied on November 25, 1996. On January 18, 1997, Plaintiff appealed this decision in the form of a letter to Swan. This appeal was denied on March 14, 1997.

Singley initially suggested that it was his belief that a white collar crime had been committed. In an October 3, 1996, letter to Gary Neuman, an investigator with the United States Department of Labor, Plaintiff contended that the "[p]lan [a]dministrator knew the [p]articipants would have their earnings frozen for a quarter, did not communicate this to participants, knew the remaining participants would profit by everyone else's gain, and thereby gained from this knowledge by remaining in the [p]lan herself after forcing others out." Plaintiff was referring here to Swan. He would later back away

somewhat from this assertion. Moreover, Swan took her distribution approximately a month after Plaintiff and was not one of the last participants in the plan. Additionally, Swan could not have known that the stock market would rise in the second quarter of 1996. Certainly, there is no indication in Swan's memorandum that participants were required to take the distribution immediately. Thus, Plaintiff apparently realized that he could not legitimately accuse Swan of any criminal wrongdoing. Nonetheless, he maintains that the reason that he was demoted and removed was that he filed a 401(k) claim.

It is also worth noting that the Railroad had no motive, economic or otherwise, for retaliating against Plaintiff for pursuing his claim. White testified that any amount due Singley as a result of his claim would have come out of the accounts of other participants in the 401(k) plan. Moreover, Plaintiff made no accusations of impropriety on the part of White. Although he hinted at impropriety on the part of Swan, there is absolutely no evidence that she convinced others to retaliate against Plaintiff for pursuing this matter. This is true despite speculation on the part of Plaintiff. For their part, neither White nor Swan indicated that they bore any ill will at Singley for having made the claim, noting that they would have done the same thing if they believed that an error had been made. As Defendants note, the amount of Plaintiff's claim was such that it would have had no economic motive to retaliate even if the amount did not come out of the accounts of other participants in the plan. *See Little,* 71 F.3d at 644 (finding that the plaintiff had failed to present a prima facie case of ERISA discrimination when the financial cost to defendant was insignificant). This is particularly true in light of the fact that Carl Belke was brought in at a significant expense to investigate the source of the problems within the department. Moreover, Plaintiff was given two years' severance pay totaling $111,000 when his job was eliminated.

Plaintiff attempts to show that the reason that he was demoted and terminated rather than Rodden was that only he filed the 401(k) complaint. However, this is inconsistent with the evidence. While not to the extent of Plaintiff, Rodden was nevertheless the victim of adverse employment action. Although neither his salary nor title changed, Rodden was placed in a subordinate position when Belke took charge of the department on an interim basis. Rodden remained in such a position when Holderread took over as Chief Transportation Officer on a permanent basis. Moreover, Rodden's duties changed as a result of these personnel moves. Hence, Plaintiff was not singled out for the problems in the Transportation Department. Indeed, the evidence indicated that Singley and Rodden were both to blame for the problems in the department. However, Holderread eventually concluded that the department needed only two individuals in management. Thus, the position of either Singley or Rodden would have to be eliminated. Holderread recommended to White that Singley's position be eliminated. The evidence indicated that this decision was based on several factors, one of which was Rodden's nearly forty years experience in the industry. Another reason for Holderread's recommendation was that his previous working relationship with Rodden had been pleasant. Moreover, the Court finds Holderread's testimony credible when he indicated that he had no knowledge regarding the merits or status of Singley's 401(k) claim. His testimony and that of others indicated that the I & M merely made a business decision to eliminate Singley's job when it was determined that only two managers were needed. Thus, the Court rejects Plaintiff's assertion that the reason that his position was eliminated rather than Rodden's was that he had filed the 401(k) claim.

In his Reply brief, Plaintiff asserts that the "smoking gun" which establishes that the employment actions taken against Singley were pretextual and therefore

show the specific intent to retaliate is the disregard of his memo on February 13, 1996, which detailed the need for more employees. However, as Defendants note, the memo that Plaintiff refers to was submitted by him several months before he filed his 401(k) claim. Therefore, it is difficult to see how it can establish the specific intent on White's part to demote and then terminate him for having submitted the 401(k) claim. Moreover, there is evidence in the record which indicates that additional train personnel were hired between February and September, 1996. In any event, Singley alleges that White allowed the situation to "fester" for several months before taking any action. Additionally, even after learning of the seriousness of the problems, he waited several more months before removing Singley. Plaintiff also contends that the only other action taken by Belke and White to address the near "mutiny" in the Transportation Department was the hiring of more personnel. Of course, Plaintiff had earlier suggested taking this measure. Nonetheless, contrary to Plaintiff's suggestion, the failure to hire additional personnel could not realistically have been part of an orchestrated plan to usher him out the door. Because Plaintiff had not yet filed his 401(k) claim, Defendants could not have had the specific intent to retaliate against him. While a lack of manpower may have contributed in part to the problems in the department, there is ample evidence in the record which suggests that Singley's managerial style was a primary cause of the discord.

This is not to suggest that Singley did not have certain abilities that benefitted the railroad. Undoubtedly, he did have certain attributes which White and others recognized. In his trial brief, Plaintiff goes to great lengths to emphasize his positive qualities. However, the evidence indicated that there were severe problems in the Transportation Department. The source of these problems was then investigated. It was determined that Plaintiff was a primary cause of the problems and

that a change needed to be made. A business decision was made to eliminate Plaintiff's position. This Court will not second-guess the Railroad's business judgment. A court does "not sit as a superpersonnel department that reexamines an entity's business decisions." *See Lindemann*, 141 F.3d at 300 (citation and internal quotations omitted). The issue therefore becomes whether Plaintiff has presented a prima facie case of ERISA discrimination.

### B. Prima Facie Case

The Court will now turn to the question of whether Plaintiff has presented a prima facie case. Plaintiff must show that (1) He belongs to the protected class; (2) He was qualified for the position involved; and (3) He was terminated or denied employment under circumstances which provide a basis for believing that the specific intent to retaliate was present. *See Salus*, 104 F.3d at 135. There is no dispute that Plaintiff belonged to the protected class. Because he was a participant in the C & IM 401(k) plan and then the G & W 401(k) plan, he had a protected right to pursue his claim. Whether or not he was qualified for the position is in dispute. Although Singley was interviewed for the position of Chief Transportation Officer, White and Belke did not seriously consider him. The fact that Plaintiff was interviewed would seem to indicate that he at least met the minimal employment qualifications for the post. However, White and Belke felt that Singley did not have the necessary "people" skills for the position. Specifically, they felt that he lacked the necessary supervisory skills and managerial philosophy and was unqualified on that basis.

Whether or not he was qualified for the position, Plaintiff has failed to present evidence that any adverse employment action was taken against him with the specific intent to retaliate for having filed the 401(k) claim and subsequent appeal. Because Plaintiff has not shown that the

prohibited intent was present, he cannot establish a violation of section 510. *See Little*, 71 F.3d at 642 n. 3; *see also Teumer*, 34 F.3d at 550. Defendants here have shown that the reason that adverse employment action was taken against Singley was because of the negative evaluations of his managerial skills. Thus, even if Plaintiff had presented a prima facie case, Defendants have offered a legitimate, non-discriminatory reason for taking the action that it did. *See Salus*, 104 F.3d at 135. Despite speculating extensively, Plaintiff has failed to show that this proffered explanation is pretextual and that the "motivating factor" behind his termination was the specific intent to interfere with his ERISA rights. Plaintiff's claim must therefore fail. *See Meredith*, 935 F.2d at 127.

### C. Loss of Benefits

Because the Court finds that Defendants did not act with specific intent in retaliation of Plaintiff filing his complaint against his 401(k) plan, the Court finds no need to make any extensive findings as to the loss of benefits.

### V. CONCLUSION

Plaintiff has failed to demonstrate that Defendants acted with the specific intent to retaliate for his having pursued a claim concerning his 401(k) account. Accordingly, Plaintiff has failed to present a prima facie case.

*Ergo*, judgment is entered in favor of Defendants Illinois & Midland Railroad Inc., Chicago & Illinois Midland Railway Co., and Genesee and Wyoming, Inc.